FILED & ENTERED

APR 02 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Shirley Foose McClure<br><br><br><br><br><br>                              Debtor. | Case No.: 1:13-bk-10386-GM<br><br>CHAPTER 11<br><br>**MEMORANDUM ON MOTION TO LIMIT LIENS OF JUDGMENT CREDITOR TO CERTAIN PROPERTIES [dkt. #340]**<br><br>Date:         March 10, 2015<br>Time:        10:00 a.m.<br>Courtroom: 303<br>                 21041 Burbank Blvd.<br>                 Woodland Hills, CA |

BACKGROUND AND STATUS

        Barrett S. Litt, individually and as a member of various law firms (referred to

jointly as "Litt"), represented Shirley McClure in bankruptcy case 92-13717 and

throughout the proceedings against the City of Long Beach, which yielded her a

substantial judgment.  Much of this money was invested in real properties in California,

Hawaii, and Michigan.

        Litt was paid attorney fees from the judgment proceeds, but sought an additional

1
2
3
4
5
6

sum of approximately $1 million by way of motion in the bankruptcy case.  In August 2009, the Court granted his motion and in November 2009 it denied McClure's motion to reconsider.  McClure filed an appeal and the judgment was affirmed by the District Court.  This was affirmed by the Ninth Circuit Court of Appeals on December 30, 2014 [12-56637].

7
8

After the initial judgment, Litt recorded abstracts of judgment, thereby creating a judgment lien on many of the properties that McClure had purchased.

9
10
11
12
13
14
15
16

On December 4, 2009, McClure filed her request for a stay pending appeal, which was continued several times by stipulation of the parties.  Finally, on May 10, 2010, the Court denied the McClure motion because she did not wish to post a bond or property as security for the order on appeal. [92-13717, dkt. #214]  McClure immediately filed a second motion for a stay pending appeal, which was granted, but allowed the Litt liens to remain and that Litt could renew the existing abstracts and liens as security for the stay pending appeal. [92-13717, dkt. #218]

17
18
19
20

On December 21, 2012, McClure filed a second chapter 11 case [originally filed in the Los Angeles division as case 2:12-bk-51709-VZ, but transferred to the San Fernando Valley division as case 1:13-bk-10386-GM].

21
22
23
24
25
26

On December 31, 2013, McClure filed this motion to use the proceeds of the sale of the Santa Monica property and to limit Litt's lien to certain properties (13-10386, dkt. 304).[1]  Various hearings were held and on September 18, 2014, the Bankruptcy Court issued a partial decision ("the Memorandum of Partial Decision," dkt. 478) that it could modify the stay to allow security for the stay to be less than all of the Real Properties.

27
28

---

[1] Because the Litt judgment was in the 1992 case, most motions, etc. were filed in both the original 1992 case and the case filed in 2012 (and now numbered as 13-10386). Unless otherwise noted, for convenience the docket numbers refer to those in case 13-10386.

To do so, Litt must remain protected against the risk of nonpayment.  Thus, the lien could be expunged from some of the real properties so long as the remaining properties adequately protected Litt's judgment claim.  The Court also decided that the amount necessary to protect the judgment would be a net equity of 200% of the judgment lien.

On September 24, 2014, the Court entered its order authorizing the Debtor to use the proceeds of the sale of the Santa Monica property. [dkt. #484].  Litt appealed to the District Court, which stayed the order, but allowed McClure to use a portion of the proceeds for certain specified items. [2:14-cv-07640-GW, dkt. 29].  This appeal is still pending, but has been continued to allow this Court to complete its work.

An evidentiary hearing was held on November 24, 2014 and on November 25, 2014 the Court entered its order establishing the fair market value of nine California properties that are subject to Litt's lien.  Although Litt objected to the process and the entire concept and cross-examined McClure's expert witnesses, he did not put on any evidence as to value.  The main thrust of the cross-examination was that the appraisals were based on "market value" and that this might not be the same as the sale price in a judicial foreclosure or execution sale.  The Court held that market value was appropriate for this case and that the total value (without consideration of the amount of existing liens or net equity) was found to be $6,434,500.  The Court then continued the hearing to January 6, 2015 on which day it planned to determine the liens against the properties and then the amount of equity available to secure the Litt judgment.  At the request of the Debtor and with the consent of Litt, this was continued several times.

The final piece – the determination of liens – was heard on March 10, 2015.  Shortly before that hearing, McClure submitted updated appraisals on several of the properties – all conducted by the original appraisers.  Litt objected to admitting these

updated appraisals and requested the right to cross-examine the appraisers, but objected to the Court's suggestion that they should appear by phone, particularly since one is in San Francisco.  Given that these were merely updated appraisals by the same appraisers who had been previously qualified as experts and that Litt had done a narrow cross-examination and put in no other evidence at the November 24, 2014 hearing, the Court asked his counsel what areas would be examined.  The only area stated was "why on November 24 did they give an eleven month old appraisal."  The Court ruled that this was not a relevant question for the appraisers, who followed the instructions of their client .  For this reason, the Court determined that cross-examination would not yield any admissible or useable evidence and accepted the updated appraisals.  This increased the total value of the nine properties to $7,172,500.  The findings of values and liens on specific properties are set forth below.

Over the course of this motion, Litt has raised various legal issues, which the Court has ruled on.  But none of these have been "final" rulings and thus were not subject to immediate appeal.  For that reason, Litt again puts these as well as new arguments before the Court and the Court includes its rulings in this final analysis of the motion.  To the extent that they concern a stay pending appeal, that is no longer relevant as the judgment has been affirmed and no further appeals of the judgment are pending.

<u>LITT'S RENEWED (and new) OBJECTIONS</u>

1.  <u>McClure's Request to Remove Litt's Lien Must be Made in an Adversary Proceeding</u>

Litt argues that McClure cannot remove Litt's lien from any of the properties unless McClure initiates an adversary proceeding.  McClure's request to remove Litt's lien falls under the provisions of Rule 7001(2) which provides:

> An adversary proceeding is governed by the rules of this Part VII.  The
> following are adversary proceedings:  . . .
>
> (2) a proceeding to determine the validity, priority, or extent of a lien or
> other interest in property, other than a proceeding under Rule 4003(d).

Failure to commence an adversary proceeding when seeking the relief of the kind listed in Rule 7001 has resulted in denial of the motion.  However, in cases where no prejudice to the parties has arisen or where no objection to the procedural defect has been lodged, certain courts allow matters to proceed by way of motions under Rule 9014 rather than as adversary proceedings.  *See, Collier on Bankruptcy*, Par. 7001.01, 16th Edition.

FRBP 9014 contemplates that not every dispute must commence in the form of a complaint, but that the court can treat some as "contested matters" and grant all the safeguards and use the procedures set forth in part VII of the Federal Rules of Bankruptcy Procedure.  Thus, where a party has proceeded by motion and the record is adequately developed, the court can reach the merits of the dispute regardless of its procedural irregularity.  *In re Braniff Int'l Airlines, Inc.*, 164 B.R. 820, 831 (Bankr., E.D.N.Y. 1994); *In re Seatco, Inc.*, 257 B.R. 469, 478 (Bankr., N.D. Tex. 2001); *In re*

1

2

*Command Servs. Corp.*, 102 B.R. 905, 908 (Bankr., N.D. NY, 1989) and cases cited

therein.

3

4

The motion filed by the Debtor contains all of the requirements to serve as a

5

complaint under FRBP 7008, incorporating FRCP 8(a).  *See,* dkt. #304.  Moreover, Litt's

6

opposition clearly sets forth his position.  Thus, this dispute is being treated as a

7

contested matter with the safeguards of Rule 7001 and Part VII to apply.

8

9

2.  The "Trial" Violates Litt's Due Process Rights

10

Litt complains that the Court is giving McClure too many chances to prove net

11

equity and that this violates his due process rights. Although he cites to Blonder-Tongue

12

13

Lab, Inc. v. Universtiy of Ill. Found., 402 U.S. 313, 317-320 (1971) for the general

14

proposition that there is constitutional protection of the right to a full and fair opportunity

15

to litigate any issue, he does not explain why curtailing this right to McClure (who has

16

often acted in pro se) is a violation of Litt's constitutional rights.  He also does not

17

specify what rules of civil procedure and of bankruptcy procedure have not been

18

followed and why a modification of those rules is a denial of due process.

19

20

In short, Litt is being given every chance to put on evidence, examine witnesses,

21

argue the law and the facts.  This is hardly a denial of his constitutional right to due

22

process.

23

24

3.  The Relief Requested by the Motion is Uncertain

25

Litt is correct that this has been a bit of a moving target.  In part, this is McClure's

26

fault because she has been hoping to hold onto all of the properties until either or both

27

of the State Board of Equalization and the Ninth Circuit have ruled.  At the beginning,

28

she was also seeking to delay sales or valuations until the real property market had

some time to recover from the 2008 downturn.  Add to this that the wheels of justice

grind very slowly.  Both sides agreed that the State Board of Equalization averages

three years to resolve an appeal – and we are now at the three year mark and they are

estimating another two years.  The two step appeal process in the federal courts also

delayed a final ruling on the judgment.  The appeal was directed from the BAP to the

District Court on December 23, 2009 (2:09-cv-09400-GW) and Judge Wu entered his

order affirming the award about two and a half years later on August 10, 2012.  McClure

immediately appealed to the Ninth Circuit, but oral argument was not scheduled for an

additional two years and three months.  The Ninth Circuit's affirmation came down on

December 30, 2014. Thus, the final status of the award of fees to Litt was in limbo for

five years, during which time the country has moved through a recession and McClure

has needed to manage these properties.

It also is not her fault that the sale on Rossmore fell through, as did one or more

of the Corbett ones.  The potential outstanding tax liability from the sale of Corbett

would be very detrimental to the estate.

Meanwhile, Litt is not suffering from this delay.  He is clearly fully protected by his

liens, which the Court has not yet removed.  His strategy seems to be to put as much

pressure on McClure as possible – perhaps it was originally in the hope of enticing her

to settle both the pending appeal to the Ninth Circuit and also her malpractice lawsuit

against him in state court.  Now only the malpractice lawsuit remains.

Whether due to unskilled management, poor economic conditions, or bad luck,

McClure is real property rich and cash poor.  She has had to come to the court hat-in-

hand to seek cash to maintain these properties and to live on.  As will be discussed

later, she has not always properly acted as a debtor-in-possession in that she delayed or failed to obtain orders for cash collateral.  This could have endangered Litt's position if a senior lienholder were to receive relief from the stay and foreclose.  However, this has not happened yet.  While the Court granted relief from stay to Citibank on the properties on which it has a lien, these are properties upon which the Litt liens will be removed, so he is in no danger of foreclosure.  As to the Corbett properties on which the Litt liens will remain, there is no indication that Pacific Mercantile Bank (the holder of the senior liens) is or will seek relief from the automatic stay or that it would be granted given the amount of equity securing the PMB liens.  In the worse case scenario for Litt, the amounts owing PMB are only about 35 percent loan-to-value and Litt could easily refinance them.

The Court does not see how McClure's actions in trying to deal with her problems denies Litt his due process rights.  The Court has always been willing to continue matters so that he can review and respond and thus any uncertainty has been resolved as the case has progressed.


4.  <u>There is No Authority Under California Law for Removing Litt's Recorded Abstract of Judgment from the Properties</u>

The arguments of the parties are summarized in the Memorandum of Partial Decision, which is incorporated herein. (dkt. 478)  The ruling on this issue, as contained in dkt. 478, is as follows:

<u>California Law</u>
Whether the Court can expunge the judgment lien from some of the Real Properties starts with state law.  Execution of a judgment is in accordance with state law.  *See* Fed. R.Civ. P. 69(1) applied in adversary proceedings by Fed. R.Bankr. P. 7069.  The creation and duration of judgment liens are governed by Cal. Code Civ. Proc. §697.310 *et seq*.

Before dealing with the issue at hand, it should be noted that Litt has no interest in the rents collected from the properties: Cal. Code Civ. Proc. §697.340(a) states that

> A judgment lien on real property attaches to all interests in real property in the county where the lien is created (whether present or future, vested or contingent, legal or equitable) that are subject to enforcement of the money judgment against the judgment debtor pursuant to Article 1 (commencing with Section 695.010) of Chapter 1 at the time the lien was created, *but does not reach rental payments*, a leasehold estate with an unexpired term of less than two years, the interest of a beneficiary under a trust, or real property that is subject to an attachment lien in favor of the creditor and was transferred before judgment.

(emphasis added).

Cal. Code Civ. Proc. §697.310(a) provides that a judgment lien on real property is created by recording an abstract of the money judgment with the county recorder. Such a judgment lien continues for ten years (extendable by renewal) from entry of judgment, unless it is released or the judgment is satisfied (which extinguishes the lien upon recording of the acknowledgement of satisfaction, pursuant to Cal. Code Civ. Proc. 697.400(a)). These provisions do not provide any mechanism for the discharge of real property subject to a judgment lien on the grounds that value of the remaining property subject to the judgment lien more than adequately secures the judgment.

At least one state's statutes do. Connecticut General Statutes § 52-380f provides:

> Any person interested, as a subsequent encumbrancer or otherwise, in any real or personal property covered by a judgment lien may apply to the court for discharge of the lien as to a portion of the property, alleging that the lien covers more than sufficient property to reasonably secure the judgment. The court may, on notice to all interested parties and on proof of such allegation, discharge from the lien any of the property which is not needed for the reasonable security of the judgment debt. . . .

The fact that the California Code of Civil Procedure (unlike Connecticut's General Statutes) does not provide a similar mechanism for the discharge of liens on real property where the value of the property subject to the lien is many times in excess of the judgment is not dispositive.

A recent bankruptcy court decision in Texas removed judgment liens in connection with its decision to grant a stay pending appeal and to allow the judgment debtor to substitute other collateral in lieu of a supersedeas bond. Royce Homes, LP v. Decker Oaks Dev. II, Ltd. (In re Decker Oaks Dev. II, Ltd.), 2008 Bankr. LEXIS 4349 (Bankr. S.D. Tex. July 21, 2008). In this decision, the judgment creditor was the debtor in bankruptcy who had obtained a $2.3 million judgment against a real estate developer in bankruptcy court. As a result of the debtor's recordation of the judgment in several counties, the real estate developer was unable to close on its sale of new homes. The Court analyzed the four factors used to determine whether to grant a stay pending appeal (likelihood of success on the merits, irreparable injury if the stay is not granted, substantial harm to other parties from the stay, and public interest) and determined that a stay pending appeal and the removal of the judgment liens were appropriate. It

also allowed the real estate developer to substitute its interest in real property not subject to the judgment lien for a supersedeas bond under the two-part standard discussed in Issue 1 above:  the judgment debtor would suffer undue hardship (because the real estate developer was unable to obtain a bond) and the substituted collateral offered protection equal to the bond.

The Debtor cites case law for the proposition that: "[t]he unmistakable policy of California is to prevent excess recoveries by secured creditors." However, each of the three cited decisions were applying California's anti-deficiency law to a second-priority lienholder purchasing at a foreclosure sale conducted by the first, and are not directly relevant.

Bankruptcy Code

The Bankruptcy law does allow modification of claims and liens arising under state law, such as Litt's judgment, and the Court will turn to an analysis of those provisions.

The cases cited by the Debtor for Bankruptcy Code authority to substitute collateral all involve *surrender* of part of real property collateral in satisfaction of debt and "indubitable equivalence" under §1129(b)(2)(a)(iii).  Thus, they are not directly applicable to this situation where the Debtor is not proposing to surrender property to Litt and is not seeking to expunge the liens through a plan of reorganization.

However, these cases are part of a larger body of case law holding that an oversecured creditor has no entitlement to hold onto collateral in excess of the amount needed to adequately protect its claim.  Although set in a different context, the Seventh Circuit eloquently stated the policy when a creditor holds liens worth roughly twice the amount of its secured claim:

So [Metropolitan's] liens are affected by bankruptcy. But is it permissible to bite into them in order to pay attorney's fees and to protect the interest of another, but junior, secured creditor? We think so, given the oversecured character of Metropolitan's claim. A security interest is--a security interest. It is not a fee simple. United States v. Security Industrial Bank, *supra*, 459 U.S. at 76. Metropolitan does not own a $ 6 million building or the rents that that building throws off month after month, year after year. It is just a creditor with a claim currently worth about $ 3.2 million that it has secured with liens against the building, and against the rents, to assure repayment. It has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest. 11 U.S.C. §§ 362(d), 363(e); In re Hanna, 912 F.2d 945, 951 n. 9 (8th Cir. 1990); In re Revco D.S., Inc., 901 F.2d 1359 (6th Cir. 1990); In re Senior Care Properties, Inc., 137 Bankr. 527 (Bankr. N.D. Fla. 1992). It has every right to complain if the trustee or debtor in possession monkeys with the security in a way that endangers its claim, but it does not argue that its claim is endangered by any of the steps of which it so bitterly complains. There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected, here by another security interest (the first mortgage). In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d

1017, 1019 (11th Cir. 1984). The absolute-priority rule is not violated, because the plan provides for Metropolitan to be paid in full with interest.

As an original matter one might think that a senior lienor should be allowed to do whatever he wants with his lien, and the junior lienors be damned. They can always buy out his interest at its face amount. But the conceded applicability of the automatic stay to suits by creditors, such as Metropolitan's receivership action, as well as the fundamental principle that a creditor obtains only a security interest and not a fee simple no matter how the parties denominate his interest, shows that neither the Constitution nor the Bankruptcy Code requires so brutally simple an approach. The first lienor is entitled to the preservation of so much of his security interest as is necessary generously to secure his claim, but to no more. He may not paralyze the debtor and gratuitously thwart the other creditors by demanding superfluous security.

In re James Wilson Assocs., 965 F.2d 160, 171-72 (7th Cir. 1991)(affirming bankruptcy court decisions (i) allowing rents to be used to pay attorney's fees and to be paid to the second-priority lienholder to protect its lien because the first remained adequately protected and (ii) confirming plan that paid attorney's fees from these same rents.)

Several Bankruptcy Code sections confirm that the secured creditors are entitled only to the amount of their collateral necessary to adequately protect their ability to be repaid from that collateral, and no more. The Code repeatedly discharges liens in excess of that amount.

Bankruptcy Code §363(c)(2) allows the use of cash collateral, so long as the claim secured by the cash is adequately protected. The Ninth Circuit has held that a 20% equity cushion provides adequate protection. In re Mellor, 734 F.2d 1389, 1401 (9th Cir. 1984)(relief from stay context); see also Pacific First Bank ex rel. RT Capital Corp. v. Boulders on the River (In re Boulders on the River),164 B.R. 99 (B.A.P. 9th Cir. 1994)(11.45% cushion adequate protection for use of cash collateral). The Debtor may use the cash collateral in excess of the amount needed to provide that adequate protection.

Bankruptcy Code §364(d) allows the debtor to prime a secured creditor (i.e. deprive it of collateral by giving another lender a higher priority security interest in the same collateral) so long as the existing secured lender is adequately protected.

Bankruptcy Code §1129 allows for the confirmation of a plan over the objections of a secured creditor so long as the secured creditor is provided with the "indubitable equivalent" of its secured claims. The Ninth Circuit has held that "indubitable equivalence" allows alteration of collateral if it does "not increase the creditor's risk exposure." Arnold & Baker Farms v. United States (In re Arnold & Baker Farms), 85 F.3d 1415, 1422 (9th Cir. 1996); Wiersma v. Bank of the West (In re Wiersma), 227 Fed. Appx. 603, 607(9th Cir. 2007). (As I do not yet have an approved disclosure statement, much less a plan before me, I will not be applying the indubitable equivalent standard at this stage in the proceedings. However, §1129(b)(2)(A)(iii) does confirm the Bankruptcy Code policy of releasing collateral from a secured lender's lien if it does not increase the creditor's risk of non-payment.)

**Conclusion:**  A judgment lien creditor, just like any other secured claim, is not entitled to be grossly oversecured, under either California judgment lien law or the Bankruptcy Code.  The goal of both California judgment lien law and the Bankruptcy Code treatment of secured claims is payment of the claim.  In other words, the law seeks to ensure that the creditor receives "adequate protection" or "indubitable equivalent" of its collateral *so that it may be paid in full*.  The Court can discharge or expunge Litt's judgment lien from some of the Real Properties and will do so if there is sufficient property subject to the lien to adequately protect Litt's judgment claim.

In dkt. #478 I went on to find that an equity cushion of 200 percent is an appropriate amount to protect Litt's lien:

Having determined that the Court may modify the terms of the stay to allow the security to be less than all of the properties currently subject to Litt's lien and may expunge the judgment lien from some of these properties, the third and final question is which Real Properties should remain subject to the judgment lien.  This raises two questions.

First, how much equity in the Real Properties should remain subject to Litt's lien to fully protect Litt against the risk of nonpayment?  Should it be the 125%, which seems to be the amount for a supersedeas bond in most districts.  Or perhaps the Court should be guided by California law and set it at 150% as required by Cal. Code Civ. Proc. 917.1(b) for cash or a surety bond.  Or should it be the 200% as required for security other than cash or a surety bond?  *"The undertaking shall be for double the amount of the judgment or order unless given by an admitted surety insurer in which event it shall be for one and one-half times the amount of the judgment or order."*  Cal. Code Civ. Proc. §917.1(b).  The amount is in the sound discretion of the Court, but at least one case holds that the value of the real property collateral should be twice that of the amount of the judgment (basing this on Cal. Code Civ. Proc. §917.1(b)).  Brooktree Corp. v. Advanced Micro Devices, 757 F. Supp. 1101, 1104 (S.D. Cal. 1990).

Litt argues that the cost of protecting his liens requires more collateral than he would need if his judgment was protected by a bond or cash.  I agree with this.  Using California as a model, it would be appropriate to require that the amount of equity be 200% of the judgment.  This would cover the expected costs of execution and the costs of appeal, etc.  Thus, the equity must be no less than $2.15 million.  In her current proposal, McClure is offering $2.4 million in equity.  (With respect to Litt's argument that the equity must be higher to cover the cost of foreclosing from a junior lien status and the possible need to conduct a partition action, the Court assumes that the Debtor will be able to show that she has 100% ownership of these properties or that Jason McClure will grant Litt a lien on his 5% portion of some of these properties.)[2]

---

[2] After the Memorandum of Partial Decision was filed in September 2014, Jason McClure's ownership interests in the properties subject to the valuation were removed and Shirley McClure is the 100 percent owner of all nine properties.

1

2

3

4

5

Second, how should the properties that will remain subject to the lien and provide that protection be chosen?   I will need to determine the actual collateral values that will protect Litt (this last step will be by way of the appraisals and, if necessary, the testimony of appraisers).  I am then inclined to offer Litt his choice of Real Properties to secure his lien, although restricting that choice to the 1033 Real Properties, leaving the Debtor free to liquidate the Real Properties that can be sold without generating negative tax consequences.[3]

6

7

**Conclusion:**  The Court will modify the terms of the stay pending appeal and expunge liens to leave sufficient property subject to the judgment lien which has a net equity of 200% of the judgment lien.

8

9

5.   <u>The Court Cannot Modify the Stay Pending Appeal in the First Bankruptcy Case</u>

10

11

Given the affirmation by the Ninth Circuit Court of Appeals, this issue is now

moot.

12

13

14

15

6.   <u>McClure's Request is a Sub Rosa Plan and Circumvents the Requirements of 11</u>

<u>U.S.C. § 1129</u>

16

17

18

19

20

21

22

23

24

25

Here Litt is repackaging an argument previously raised and addressed in the

Memorandum of Partial Decision (dkt. 478, pp. 7-14), *i.e.,* that the Debtor's bankruptcy

can only affect Litt's liens through a confirmed plan of reorganization and the removal of

Litt's liens cannot fulfill any of the requirements of §1129(b)(2)(A) (and so the plan could

not be confirmed).  This Court has ruled that it may expunge or discharge Litt's lien from

some of the Properties by motion.  (dkt. 478, pp. 13-14)  Litt now additionally argues

that the removal of his liens from some of the Properties is a *sub rosa* plan

circumventing the requirements of §1129(a)(2)(B), citing *In re Continental Air Lines,*

*Inc.*, 780 F.2d 1223, 1226-1228 (5th Cir. Tex. 1986).

26

27

28

---

[3] At the hearing on March 10, 2015, the Court decided to allow the Debtor to select the properties that would remain subject to Litt's lien.

The *sub rosa* plan objection is typically raised in a §363(b) sale, where all or a substantial portion of the assets are being sold, either because:  (i) the sale of substantially all of the debtor's assets in and of itself may be considered a *sub rosa* plan, *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. N.Y. 1983), or (ii) the proposed transaction has the effect of dictating the terms of a plan and thereby will "short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan." *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir. 1983).  Litt is raising the second of these issues.

Numerous problems exist with his argument.  First, it is not clear that the *sub rosa* plan objection applies to anything other than §363 sales, and possibly settlement agreements. The vast majority of *sub rosa* plan cases involve §363 sales. In fact, many decisions, including the *Continental* decision cited by Litt, discuss this *sub rosa* plan objection as if it were limited to §363 sales.  *See, e.g., Continental*, 780 F.2d at 1227-1228 ("In *Braniff* we recognized that a debtor in Chapter 11 cannot use §363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization."); *Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.),* 250 F.3d 955, 960-961 (5th Cir. 2001)("*Braniff* stands merely for the proposition that the provisions of §363 permitting a trustee to use, sell, or lease the assets do not allow . . . .)  The *sub rosa* plan objection has also been raised in approving settlement agreements under Fed. R. Bankr. P. 9019.  *See, e.g., Taylor v. Mega-C Power Corp. (In re Mega-C Power Corp.),* 2006 Bankr. LEXIS 4852, at *17-18 (B.A.P. 9th Cir. Sept. 29, 2006); *In re Equa-Chlor LLC*, 2008 Bankr. LEXIS 1341 at *10 (Bankr. W.D. Wash. Apr. 29, 2008).

Even if the objection were applicable in this non-sale context, it is not clear that the alteration of Litt's lien is the type of extensive dictation of terms necessary to constitute a *sub rosa* plan. *See, e.g., Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.),* 119 F.3d 349, 355 (5th Cir. La. 1997)(the settlement does not "alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in" *Braniff*); *Babcock & Wilcox*, 250 F.3d at 960-961 (*Braniff* does not allow use of §363 "to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan").

More fundamentally, the relief sought is not a *sub rosa* plan because it is not seeking to set the treatment of Litt's lien under a plan, *i.e.,* it does not dictate the distributions to be made on account of Litt's claim under a plan.

> Both appellants argued that the settlement was a *de facto* or *sub rosa* plan of reorganization, citing *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir. 1983) and *In re Continental Airlines, Inc.,* 780 F.2d 1223 (5th Cir. 1986). In each of these cases the court found the transaction to be a *sub rosa* plan because it dictated plan terms, essentially binding creditors to a particular distribution scheme. *See Braniff*, 700 F.2d at 939-40; *Continental*, 780 F.2d at 1227-28. We need not address that argument in the limited remaining scope of this appeal, which regards only the immediately effective terms. We do note that the settlement agreement does not dictate potential distributions to creditors or shareholders - that will be governed by whatever plan (if any) is confirmed.

*Mega-C Power*, 2006 Bankr. LEXIS 4852, 17-18. Rather, this Court is determining Litt's rights and claim under bankruptcy and applicable non-bankruptcy law. That claim will

then be entitled to distributions under a plan of reorganization, to be determined under

the protections of §1129.

Finally, Litt is wrong when he states that his lien could not be altered under

§1129.  As discussed in detail in the Memorandum of Partial Decision (dkt. 478, pp. 11-

13), the Ninth Circuit has recognized that alteration of collateral may provide indubitable

equivalence under §1129(b)(2)(A)(iii) - if it does not increase the creditor's risk of

exposure. *Arnold & Baker Farms v. United States ex rel. United States Farmers Home

Admin. (In re Arnold & Baker Farms),* 85 F.3d 1415, 1422 (9th Cir. 1996); *Wiersma v.

Bank of the West (In re Wiersma)*, 227 Fed. Appx. 603, 607 (9th Cir. 2007). The

Seventh Circuit has allowed a creditor's liens to be affected by a plan on the grounds

that the secured creditor is not entitled to "a security interest that is far in excess of the

claim secured by it." *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992).


7.   <u>McClure Has Not Offered Any Evidence of Appraisals as to the Value of the
     Creditor's Collateral</u>

Litt has raised this issue several times, but the Court has never been persuaded

that the Court need do more than value the property at fair market value, determine the

equity available to cover Litt's lien and any equity cushion behind it.  This is the same

technique used for any junior lien.  The extra risk taken by the possibility of foreclosure

of the senior lien(s) is generally absorbed by the higher interest rate at which the junior

lien accrues.  Since this is a federal judgment it is only accruing interest at 0.420% per

annum.

However, the requirement that the total equity available to Litt must be at least 200% of the judgment certainly provides a measure of comfort that allows the Court to use the normal valuation method.

This objection is overruled.

8.  McClure's Monthly Operating Reports are Incorrect or Missing

9.  McClure is Operating and Using Cash Collateral Without Court Authority

10. McClure Has Not Renewed Her Authority to Use Her Other Lenders' Cash Collateral

11. McClure Cannot Meet the Tax Liabilities Associated With Her Properties

12. McClure's Case is Not Moving Forward

13. Dismissal or Conversion Puts Litt at Substantial Risk if the Court Removes his Lien from the Properties

These six objections (## 8-13) deal with whether this case can continue in chapter 11 and, if so, whether McClure should remain as a debtor-in-possession. These are not directly relevant to this motion except as they may impact what happens if the Court dismisses or converts this case.  The Court is monitoring issues ##8, 9 and 10.  Number 8 seems to be a mathematical issue that is being resolved with the Office of the United States Trustee and the Court has just ruled that the Debtor need not revise all prior reports, but need only prepare current correct ones.  As to #9 and #10, there is a current cash collateral order with Pacific Mercantile Bank and at the March 10, 2015 hearing relief from stay was granted to City National Bank on other properties, but

these are properties on which the Litt lien will be expunged.[4]

As the Court understands it, the tax issue concerns McClure's personal tax obligation if she transfers the property and is not a lien on the properties themselves. Thus it does not reduce the equity available to Litt.  As they concern McClure's ability to reorganize, the taxes may or may not be vacated.  If they are not vacated, this will definitely affect the plan and the amount that she can pay to unsecured and administrative creditors.  But Litt does not fall into either of these categories.  Beyond that, McClure may recover some or all of the penalties by way of her malpractice suit. This is all too uncertain at this time to play into the valuation issue.

The Court fully agrees that this case is moving at a snail's pace.  But as noted above, that is largely due to the delays caused by the appeal – which took five years to resolve.  This objection is overruled as to the valuation issue.

Litt argues that if his "judgment lien is stripped from properties and the case is later dismissed, he will leave bankruptcy with less security than he had coming in." While this might be mathematically true, the 200% equity cushion is intended to provide sufficient protection to him.  There is no reason that he should be able to tie up a vast amount of equity that is not needed to protect him since he is only entitled to be paid 100% of his judgment and not more.

14. McClure is Equitably Estopped from Arguing that Litt's Liens Should be Stripped

In Litt's Brief for the Trial on Debtor's Motion to Use Proceeds Subject to Litt's Lien and Limit Litt's Lien to Certain Properties ("Brief," dkt. 553 ), Litt asserts that McClure is

---

[4] The docket is somewhat confusing since the cash collateral stipulation with Pacific Mercantile Bank, which was signed on 9/30/14 and filed on 10/4/14, refers in its body to a final date of 4/30/13 or such later date as may be agreed to in writing by PMB and the Debtor and approved by the Court. (dkt. #502, p. 5). However it also notes prior cash collateral orders dated 2/1/13, 10/17/13, and 2/10/14 (p. 3).  The parties should file the proper stipulations and proposed orders so that this is clarified.

equitably estopped from arguing that Litt's lien should be stripped because McClure had previously argued that Litt's lien is not perfected. Litt states that McClure is taking inconsistent positions before the various courts.

Litt contends that at the District Court and Ninth Circuit hearings McClure claimed that Litt's liens were unperfected. As a result, according to Litt, the District Court and the Ninth Circuit issued some favorable rulings for McClure. Thus, McClure cannot now argue that Litt's liens are perfected and should be stripped; to allow McClure to pursue a different position in this Court is unjust. Litt cites to *New Hampshire v. Maine,* 532 U.S. 742, 750-751 (2001) for the proposition that judicial estoppel precludes a party from gaining an advantage by asserting one position and then later seeking an advantage by taking another position. *See also Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778 (9th Cir. 2001). He states that "McClure has now forfeited her right to challenge those liens by taking and securing an advantage in other courts arguing that the liens are unperfected." *See, Brief,* p. 13.

On the other hand, McClure claims the judicial estoppel argument is just not applicable in this situation. McClure asserts that Litt has not demonstrated inconsistent positions, let alone inconsistent positions that have given McClure an unfair advantage. Thus, the *Hamilton* requirements have not been satisfied. *Hamilton v. State Farm Fire & Cas.,* 270 F.3d at 782.

The Court finds Litt's judicial estoppel argument unpersuasive. A court will invoke judicial estoppel "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings and to protect against a litigant playing fast and loose with the courts." *Hamilton v. State Farm Fire &*

*Cas.,* 270 F.3d at 782.  Further, the United States Supreme Court has listed three

factors a court may consider in determining whether to apply judicial estoppel:

> First, a party's later position must be clearly inconsistent with its earlier position.
>
> Second, courts regularly inquire whether the party has succeeded in persuading
>
> a court to accept that party's earlier position…Absent success in a prior
>
> proceeding, a party's later inconsistent position introduces no risk of inconsistent
>
> court determinations, and thus no threat to judicial integrity.  Third, whether the
>
> party seeking to assert an inconsistent position would derive an unfair advantage
>
> or impose an unfair detriment on the opposing party if not estopped.  *New*
>
> *Hampshire v. Maine,* 532 U.S. 742 (2001).

Even if it is correct that McClure has argued inconsistent positions, which this

Court has not found, this Court does not believe that McClure has gained any unfair

advantages in any of the Courts.  The rulings by the District Court, as well as the Ninth

Circuit, are not based on an argument that Litt's lien is unperfected.  Thus, there is no

risk of inconsistent court determinations, no threat to judicial integrity, and no unfair

detriment to Litt.


At the hearing on March 10, 2015, the Court invited Litt's attorneys to review the

list of issues as set forth above and add any others that had been raised.  The reply

specified the following.[5]   Most were dealt with in the tentative rulings or are considered

and discussed above.  None of them are dispositive of matters before this Court.  Thus

they are not repeated or separately ruled on here.

---

[5] Dkt. #641.

A. Litt's Evidentiary Objections to: (1) Declaration of Debtor on Status of Obtaining Loan Pay-Off Information and Declarations from Person who Prepared this Information for Pacific Mercantile Bank; (2) Updated-Declaration of Debtor on Status of Obtaining Loan Pay-Off Information and Declarations from Person who Prepared this Information for Pacific Mercantile Bank; and (3) Declaration of Debtor on Status of the Loan Pay-Off Figures for the Three Current City National Bank Loans, filed on January 13, 2015 *(docket no. 577)*;

B. Litt's Response to the Debtors Reply to Litt' Brief for the Trial on Debtors Motion to Use Proceeds Subject to Litt's Lien and Limit Litt's Lien to Certain Properties, filed on January 13,2015 *(docket no. 578);*

C. Litt's Objections to the Status and Updated Appraisal of February 2, 2015 of 510 S. Hewitt# 102 Los Angeles, CA 90013 for Use at the Continued Property Valuation Hearing, filed on February 23,2015 *(docket no. 614);*

D. Litt's Objections to the Updated Appraisals as of February 17, 2015 for 910 Corbett Avenue, Units 1, 2, & 3, San Francisco, California 94121 and Status for Use at the Continue Property Valuation Hearing, filed on February 23, 2015 *(docket no. 615);* and

E. Litt's Objections To The Declaration Of Robert M. Mogannam in Support of Updated Appraisals as of 910 Corbett Avenue, Units 1, 2, & 3, San Francisco, California 94121, filed on February 23,2015 *(docket no. 616).*

## RULINGS

For purposes of clarification, it should be noted that McClure did not present all of her properties for appraisal.  In addition to the nine properties shown in the table below, she has title to the following which are subject to Litt's lien:

316 Rossmore, #307, Los Angeles, CA 90004

2622 30th Street, Santa Monica, CA 90405

3401 W. Gregory Ave., Fullerton, CA 92833

93 Invitational Dr., Gaylord, MI 49735

145 N. Otsego, Gaylord, MI 49735

345 E. Felshaw, Gaylord, MI 49735

Lot 13 Loon Lake Lot, Gaylord, MI 49735

Based upon the evidence presented through the declarations, the Court finds as follows:

Costs of Sale – Litt points out that in the past McClure has estimated that if she were to sell the properties, she would incur about 9 percent cost of sale.  Thus, according to Litt, the amount of equity available to him should be reduced by 9 percent of the market value.

The Court does not find that this should be calculated into the equity available to protect Litt.  It must be remembered that he has a judgment lien and not a deed of trust. If there is a third-party buyer at the execution sale, Litt would be paid in full on his lien and the only costs involved would be those charged by the Sheriff for running the sale which seems to be a nominal amount. And even if Litt takes the property at the execution sale through a credit bid, while eventually he might sell one or more of these

income-producing properties, he may decide to keep them once he has title.  To the

extent that there are some costs in executing on the properties, Litt is receiving an

equity cushion of 100 percent judgment-to-value, which is more than adequate to

protect him.

But as an additional safeguard, the Court will include in the order a set of

triggering events that would eventually relieve Litt of the automatic stay.  Specifically,

Litt will be entitled to seek relief from the automatic stay if (1) PMB (or whoever is the

current holder of the first lien(s) at that time) obtains relief from the automatic stay to

begin or continue foreclosure,  or (2) Litt has evidence that McClure has missed at least

three payments to PMB, or (3) Litt has evidence that the total fair market value of the

property has declined by at least 15 percent, or (4) some other occurrence has

happened which puts Litt's lien in jeopardy, such as a substantial violation of city

ordinances.  This will apply only to the individual property or properties on which

McClure has defaulted or the action is taken if that default/action is on fewer than all

three properties.


Disputed Attorneys' Fees – Although McClure disputes the amount of attorneys'

fees included in the payoff demands, for purposes of this motion the Court is including

all attorneys' fees in the senior lien amounts.  Because Litt holds a judgment, he is not

entitled to attorney's fees for his work on obtaining it or seeking to enforce it.


Withholding of Capital Gains Tax – The question arose as to whether there would

be a 3.34 percent holdback for capital gains taxes on the sale of the properties by

McClure.  The law behind this was never resolved since it is simply not relevant to an

1    execution sale by Litt.

2        The Court finds that the fair market value of the nine properties considered by the

3    Court, the amount of the senior liens, and the equity available to Litt are as follows:

| Property | Fair Market Value | Debt From Lender Payoffs | Equity |
|---|---|---|---|
| 12435 Benton, #3, Rancho Cucamonga, CA 91739 | $386,000.00 | $283,380.46 | $102,619.54 |
| 12435 Benton #4, Rancho Cucamonga, CA 91739 | $400,500.00 | $283,751.92 | $116,748.08 |
| 13621 Dalmation Ave., La Mirada, CA 90638 | $486,000.00 | $237,288.20 | $248,711.80 |
| 218 N. Harrington, Fullerton, CA 92831 | $570,000.00 | $236,232.96 | $333,767.04 |
| 510 S. Hewitt, #102, Los Angeles, CA 90004 | $1,293,000.00 | $882,619.31 | $410,380.69 |
| 1418 E. Riverside, Fullerton, CA 92831 | $587,000.00 | $237,288.20 | $349,711.80 |
| **TOTAL EXCLUDING CORBETT** | **$3,722,500.00** | **$2,160,561.05** | **$1,561,938.95** |
| | | | |

| Property | Fair Market Value | Debt From Lender Payoffs | Equity |
|---|---|---|---|
| 910 Corbett Avenue, block 2799, lot 072 (unit #1) | $1,100,000.00 | $405,201.53 | $694,798.47 |
| 910 Corbett Avenue, block 2799, lot 073 (unit #2) | $1,100,000.00 | $405,201.53 | $694,798.47 |
| 910 Corbett Avenue, block 2799, lot 074 (unit #3) | $1,250,000.00 | $405,201.53 | $844,798.47 |
| **TOTAL CORBETT** | **$3,450,000.00** | **$1,215,604.59** | **$2,234,395.41** |
| | | | |
| **TOTALS** | **$7,172,500.00** | **$3,376,165.64** | **$3,796,334.36** |

Ms.McClure has chosen the three Corbett properties as those on which the Litt lien will remain.  This is an appropriate choice as these are prime properties in San Francisco and are increasing in value.  The total available to Litt is in excess of $2.2 million and therefore meets the requirement of 200 percent of the amount of the judgment.  There appears to be no dispute that as to the status of Corbett: Ms. McClure is current on her payments and has a cash collateral agreement with PMB, the holder of the first. She is also current on her property tax payments.

Litt's counsel has advised that Litt will be seeking a stay pending appeal and this will be ruled on by this Court when it is brought.  But I wish to advise the parties that if an appeal is filed, I believe that it should be a direct appeal to the Ninth Circuit Court of

Appeals pursuant to 28 U.S.C. §158(d)(2).  This case involves several issues of first

impression and the intertwining of state law and bankruptcy law.  It also follows years of

delays.  McClure filed her bankruptcy in 1992 because of a taking of her property by the

City of Long Beach.  This was litigated in the District Court to a final judgment, which

took twelve years to resolve.  Litt's motion for increased attorney fees was decided in

2009 by this Court and then took another five years to final resolution before the Court

of Appeals.  A direct appeal seems warranted under these circumstances as it will also

materially advance Ms. McClure being able to manage the fruits of her initial lawsuit

against the City of Long Beach rather than face another prolonged delay which would

likely lead to the loss of one or more of these valuable assets.  Given the time of the two

step appeal process, it is otherwise likely that Ms. McClure will be delayed until at least

2020, a period of almost thirty years from the wrongful act of the City of Long Beach

which started her journey through the federal court system.

###

Date: April 2, 2015

_____
Geraldine Mund
United States Bankruptcy Judge