FILED & ENTERED

JUL 12 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

In re:

Shirley Foose McClure

Debtor(s).

Case No.: 1:13-bk-10386-GM

CHAPTER 11

**MEMORANDUM OF OPINION PARTIALLY GRANTING MOTION TO CONVERT BY ORDERING APPOINTMENT OF A CHAPTER 11 TRUSTEE (Dkt. 327)**

Date:        July 12, 2016
Time:        10:00 AM
Courtroom:  303

Pacific Mercantile Bank ("PMB") has moved for an order converting this chapter 11 to chapter 7 pursuant to §1112(b).  PMB filed this motion (the "Conversion Motion") on January 20, 2014.  A hearing on the Conversion Motion was first held on February 18, 2014 and it has been continued from time to time, with the latest continued hearing date on July 12, 2016.

**Background**

Initial Case

Debtor initially filed for chapter 11 relief in 1992 (the "Initial Case").  Although Debtor confirmed a plan of reorganization, this case has remained open as a result of an appeal of an attorneys' fee award (described below).

Debtor and her son Jason McClure brought a lawsuit against the City of Long Beach regarding their attempts to convert their existing properties in Long Beach to residential care facilities.  In 2006, the Debtor and her son received $20 million in settlement of this lawsuit – 95% for the Debtor and 5% for her son.  Barrett Litt and his law firms ("Litt") had represented them in this lawsuit since 1993.

The Debtor's and Litt's relationship broke down.  Debtor asserts that: (i) Litt took $9 million from the $20 million settlement without bankruptcy court approval, (ii) Debtor and her son entered into an IRC §1033 election for the majority of their settlement funds and invested in various real estate rental properties pursuant to that election ("1033 Properties") on advise of Litt and tax counsel provided by Litt and malpractice was committed respecting that advise.  In July 2008, the Debtor brought a malpractice action against Litt which is pending in Superior Court (BC-393584).

On April 3, 2009, Litt filed his final application in the Initial Case, seeking fees of $9,097,265.25 and costs of $990,592.06. (Initial Case dkt. 124).  This was hotly contested by McClure, but the Court granted the motion and awarded fees of $9,113,911.51 and costs of $990,592.06 with a credit of $9 million that had already been paid to Litt, so the remaining amount owed was $1,104,503.57. (Initial Case dkt. 146).  The Court denied a motion to reconsider by McClure (Initial Case dkt 150, 179,

182) and McClure appealed.  (Initial Case dkt 181). The District Court and the Ninth

Circuit upheld the fee award on appeal. (McClure has brought another malpractice

action against attorneys who represented her in this fee dispute with Litt. (McClure v.

Tidus, et al. BC-443404).)

In the meanwhile, Litt obtained and filed an abstract of judgment against thirteen

real properties in which the Debtor had an interest.  (Initial Case dkt 154, 155). The

Court granted McClure a stay pending her appeal on the following terms: Litt would

retain (and could renew) his existing liens from the recorded abstracts of judgment,

judgment liens, and the judgment debtor examination lien, as security for the stay

pending appeal.  Litt could pursue other enforcement remedies on notice and

opportunity.  This order was without prejudice to modification upon appropriate

application by any party.  (Initial Case dkt. 218).


This Chapter 11

Debtor filed this case for Chapter 11 relief on December 21, 2012.  Her estate's

assets were comprised of her interest in multiple parcels of income producing

residential real estate in Southern California, San Francisco, Maui, Indiana and

Michigan (the "Properties"), most of which were 1033 Properties and owned 95% by the

Debtor and 5% by her son.  The major claims against the estate were (i) approximately

$460,000 in unsecured claims, (ii) secured lender claims of City National Bank ("CNB"),

Pacific Mercantile Bank and its affiliate PM Asset Resolution, Inc. ("PMB"), and

Shellpoint Mortgage Servicing for Bank of New York, as trustee ("Shellpoint Mortgage"),

each secured by deeds of trust on various real estate, (iii) Litt's lien on most of the

Properties, and (iv) a $1,317,047 priority tax claim by the Franchise Tax Board ("FTB").

Over the course of this case, the Debtor has sold a number of the Properties, using the money to repay some of her secured debt, for repairs and maintenance on other Properties, and to pay other expenses of the Properties and of this Chapter 11 case.  (Most significantly, CNB held a deed of trust on four properties, but has been paid off though the sale of its collateral: 2622 30th Street in Santa Monica, CA; 316 North Rossmore #307 in Los Angeles; 2345 Benton # 3 in Rancho Cucamonga; and 2345 Benton # 4 in Rancho Cucamonga.)

The following three secured creditors remain:

1. PMB has five outstanding loans with Debtor, with a total outstanding balance of approximately $2.1 million (according to the Debtor's latest disclosure statement – Dkt. 1016 at 88), secured by:

**Corbett:**  910 Corbett St., Nos. 1, 2 and 3, San Francisco, CA, which was valued by the Court at $3.45 million as of March 2015 and appraised by Debtor's appraiser's at $3.85 million as of May 2016.

**Dalmatian:** 13621 Dalmatian Ave., La Mirada, CA, which was valued by the Court at $486,000 as of March 2015 and valued by the Debtor's realtor at $595,000 as of May 2016.

**Honoapiilani:**  4365 Lower Honoapiilani Road, #120 (Royal Kahana), Lahaina, Hawaii, which was not valued by the Court in March 2015 and valued by Debtor's realtor at $498,000-$525,000 as of May 2016.

**Harrington:** 218 N. Harrington, Fullerton, CA 92831, which was valued by the Court at $570,000 as of March 2015 and valued by the Debtor's realtor at $595,000 as of May 2016.

**W. Gregory:**  3401 West Gregory Avenue, Fullerton, CA, which was valued at

$243,000 in the Debtor's most recent disclosure statement (dkt. 1016 at 36:4).

(Debtor's residence, owned 50% Debtor and 50% Jason McClure.)

(Property values – except W. Gregory - from Current Property Value Charts filed by Debtor [dkt. 1052] at 5:12-6:4.)

2. Shellpoint Mortgage has one loan with a balance of $900,000 (according to the Debtor's latest disclosure statement – [dkt. 1016] at 88). This loan is secured by a deed of trust on **Hewitt** (510 S. Hewitt # 102, Los Angeles, CA), which was valued by this Court at $1,293,000 as of March 2015.

3. Litt (as a result of his abstracts of judgment) had liens on all of the above-described properties except Honoapiilani (the "Litt Lien"). After extensive evidentiary hearings, the Court entered an order and memorandum limiting Litt's lien to the Corbett Properties, which at the time had equity of more than $2.2 million (dkt. 654). Litt has appealed this ruling and his appeal is currently pending in the District Court.

In addition to the above-described properties, the Debtor has three real properties in Gaylord, Michigan that are not subject to Deeds of Trust: (1) **Otsego:** 145 N. Otsego; (2) **Invitational:** 93 Invitational Drive; and (3) **Invitational Lot:** Lot 3, Invitational Drive, in which the Debtor holds only 50% title. The values of these Properties (estimated by the Debtor's broker as of May 2016) are $300,000 for Otsego and $440,000-$450,000 for Invitational and the Invitational Lot collectively. (With Court approval, the Debtor sold two other Properties not subject to deeds of trust: 345 E. Felshaw in Gaylord MI and 1430 Hilo Drive in Bluffton, IN.)

It appears that all of the Debtor's remaining Properties are 1033 Properties, although it is not clear whether Debtor's home falls into this category. The purchase of the 1033 Properties deferred Debtor's income tax payable on her $20 million settlement

with the City of Long Beach, but did not eliminate it. As the Court understands it, when the 1033 Properties are sold, their basis will be close to zero, so that virtually all proceeds of sale will be capital gains.

The FTB's $1.3 million claim is based on a final assessment disallowing Debtor's 1033 election on her 2006 tax return and disallowing $1 million in legal fees paid to Litt. Debtor has appealed this FTB assessment, but has recently informed the Court that she expects to lose this appeal.  Furthermore, according to the Debtor, it is highly likely that the IRS will use the FTB assessment to place a "piggyback" assessment on the Debtor's 2006 federal return.

The Debtor has retained and parted ways with three different bankruptcy counsel and has represented herself *pro per* throughout much this case. On April 2, 2013, the Court approved the retention Greenberg & Bass, the Debtor's initial bankruptcy counsel. (Dkt. 125.) On August 11, 2014, the Debtor filed a substitution of attorney, replacing Greenberg & Bass with herself *pro per.* (Dkt. 435). Shortly thereafter, the Court approved the retention of Faye Rasch as special bankruptcy counsel (with the Debtor to do most of the work) effective October 29, 2014. (Dkt. 558.)  After the Court repeatedly told the Debtor that this chapter 11 case would not move forward successfully without experienced, competent bankruptcy counsel, the Debtor retained Weintraub & Selth as general bankruptcy counsel.  The Court approved their retention on January 5, 2016. (Dkt. 861.)  At that time Ms. Rasch withdrew from active participation except as to  Litt appeal of the "lien strip." (2:14-cv-07640-GW)

On May 17, 2016, the Debtor filed a substitution of attorney, replacing Weintraub and Selth with herself *pro per.* (Dkt. 1029). At the June 7 hearing on approval of the Debtor's Third Amended Disclosure Statement, the Court forcefully reminded the Debtor

that she could not successfully conduct this case *pro per* and she must find counsel.  In

her latest filing with the Court, the Debtor states that she working to "retain experienced

bankruptcy counsel to work with her on Plan Amendments which will be required."  (Dkt.

1052 at 5:16-17.)  Now she indicates that she is in discussions with Michael Spector,

who may be willing to represent her once he is paid a retainer. (Status report filed

7/5/16. 4:2-6; 5:15-16).  The Court is not familiar with Mr. Spector, but from his webpage

it appears that he is a sole practitioner and a bankruptcy specialist with an office in

Santa Ana.  Thus is appears that all of the counsel hired or proposed in this case are

qualified to do the work.  It is the repeated change-over that is a problem.  This case is

now 3 ½ years old and Ms. McClure has had three (and soon four) bankruptcy attorneys

separated by periods when she represented herself.  In fact, Mr. Rasch was only

special counsel and the Debtor served as her own general counsel (pro se) during that

time.

Debtor filed her original plan and disclosure statement on October 1, 2013. (Dkt.

251, 252.)  A number of creditors objected to the approval of the disclosure statement.

On December 20, 2013, the Debtor filed a First Amended Disclosure Statement

describing her First Amended Plan, which dealt with some of the issues raised by

creditors with respect to the original plan and disclosure statement (although no hearing

was ever held on the original disclosure statement). (Dkt. 299.)  Creditors objected to

approval of the First Amended Disclosure Statement, and hearings on its approval were

repeatedly continued.  On September 2, 2014, the Debtor filed her Second Amended

Disclosure Statement describing her Second Amended Plan. (Dkt. 457.) Creditors again

objected to approval of the Second Amended Disclosure Statement and hearings were

repeatedly continued, together with the status conference for this case and the hearing

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

on this Conversion Motion.

On March 25, 2015, as part of its ruling on this Conversion Motion, the Court set September 11, 2015 as the deadline for the Debtor to file "an amended plan that is facially feasible and an amended disclosure statement in connection therewith." (Dkt. 644.)  At a September 29, 2015 status conference, the Court reset this deadline to November 13, 2015.  Due to the Debtor's illness and hospitalization in the fall of 2015, at a December 8, 2015 status conference the Court extended that deadline to February 12, 2016.  Upon *ex parte* application of the Debtor, the Court again extended the February 12, 2016 deadline to file a plan and disclosure statement until April 25, 2016 (Dkt. 931.)

The Third Amended Plan and Disclosure Statement were originally filed on April 25, 2016, but refiled on May 3, due to a procedural irregularity in the April 25 filing ("Third Amended Plan and Disclosure Statement"). (Dkt. 1019, 1020)  This Third Amended Plan provided for PMB to be paid out – from either the refinancing of PMB's loan or the sale of Corbett.  (Unless the Corbett sale proceeds were insufficient to pay PMB in full, in which case the PMB loan would be reinstated.)  If Corbett were sold, then Litt's lien would be transferred to three other Properties (with substantially less equity). Shellpoint Mortgage would be given a 20-year negatively amortizing loan. Unsecured creditors would be paid out the proceeds of the malpractice lawsuits. The FTB claim would be paid within five years of the effective date.

A hearing on approval of this Third Amended Disclosure Statement was set for June 7, 2016 – to be heard at the same time as this continued Conversion Motion. Approval was opposed by Litt and by Sulmeyer, Kupetz (a major unsecured creditor). The Court's tentative ruling identified numerous issues with both the disclosures in the

-8-

Third Amended Disclosure Statement and the confirmability of the Third Amended Plan.

Among other problems, the FTB's over $1.3 million priority tax claim had to be paid

within the five years of the *petition date*, as required by §1129, and the projections

attached to the Third Amended Disclosure Statement did not indicate that the Debtor

has the means to do so.  Also, PMB could not be reinstated under §1124 if Corbett were

sold and Litt's lien could not nonconsensually be transferred to Properties with less

equity under §1129(b).  Further, payment of the unsecured creditors from malpractice

litigation proceeds is too speculative and there appeared to be no other source of funds

to pay unsecured creditors.

However, counsel for PMB stated on the record at the June 7 hearing that PMB

was in negotiations with the Debtor, and asked that the hearing be continued to see if

the Debtor and PMB could reach an agreement over the treatment of PMB's secured

claim.  The hearings on both the Third Amended Disclosure Statement approval and

this Conversion Motion were continued to July 12, 2016.


**PMB Supplemental Memorandum**

PMB has now filed its Supplemental Memorandum in support of the Conversion

Motion.  PMB states that its negotiations with Debtor's prior counsel had been very

constructive, but PMB's meeting with the Debtor the day after the June 7 hearing

essentially eroded all progress, with the Debtor stating that she could not at this time

say how PMB's claim would be treated.

Thus, PMB is renewing its request for this case to be converted to a chapter 7 for

cause under §1112(b)(4)(A): substantial and continuing loss to or diminution of the

estate and the absence of a reasonable likelihood of rehabilitation.  The loss comes, at

least in part, from the substantial administrative expenses that built up over this case:

PMB calculates, based on the Debtor's pleadings, that the Debtor has incurred fees in

excess of $300,000 for bankruptcy counsel alone.  For the absence of likelihood of

reorganization, PMB cites (i) the long history of this case during which the Debtor has

failed, despite numerous opportunities, to file a facially confirmable plan of

reorganization and the Debtor's Third Amended Plan, which failed to offer creditors the

treatment required by §1129 and was facially not feasible. The Debtor is simply unable

to timely pay the (well over) $1.3 million FTB claim, not to mention the possible piggy-

backed assessment by the IRS.  The Debtor has failed to line up any creditor

constituencies to support her plan.

   PMB argues that cause is also shown by the Debtor's failure to file a facially

feasible plan by the April 25, 2016 deadline set by this Court.  Section 1112(b)(4)(J)

provides that the failure to file a disclosure statement within the time fixed by order of

the court is cause for conversion.


**McClure Status Report and Other Papers filed on July 5**

   On July 5, Ms. McClure filed a status report; the declaration of A. Lavar Taylor as

to discussions with the FTB on payment of their claim; an application to employ the law

offices of A. Lavar Taylor as special bankruptcy tax counsel and to pay it a $20,000

retainer from the Benton sale proceeds; and an application to employ and pay Keller

Williams as the real estate broker to list Hewitt

   In summary, McClure describes her meeting with PMB and that she needs to

wait to work out her financial picture until the final FTB assessment has occurred and

she has arranged a repayment plan with the FTB.  Her proposed special tax counsel

believes that he can obtain an agreement with the FTB to pay the $1+ million

assessment over a longer period rather than as required by the bankruptcy code.

McClure states that she is in discussions with Michael Spector to be her new general

bankruptcy counsel and hopes to retain him once the retainer funds can be disbursed.

Mr. Spector has requested a continuance of this motion to convert until that time.

Hiring the Taylor law firm would only be to have him arrange a payment plan with

the FTB.

As to Hewitt, since the tenants vacated on July 1, she hopes to sell it and wants

to employ the broker.  She and her assistant have been doing repairs to get it ready for

marketing.


**PMB Reply**

On July 7, PMB filed a reply to the newly filed status report, etc.  PMB again

points out that the FTB priority claim of $1+ million must be paid by the end of 2016

unless she can obtain an agreement to defer that date.  Also that there might be a

piggy-back assessment by the IRS.  This makes for a situation where no plan can be

confirmed.  Her most recent plan violates the absolute priority rule.  No constituent

group has agreed to this plan and at the meeting with PMB McClure could not say how

she proposed to treat PMB.  This is all reinforced by her supplemental papers.

It was the Debtor's choice to substitute out her prior attorney and she should not

be given more time based on that decision.  There should be no more delays.


**Joinder**- Litt has filed a joinder in support of the motion.

**Analysis**

Section 1112 of the Bankruptcy Code governs conversion of a chapter 11 case to

chapter 7:

> (b)(1) Except as provided in paragraph (2) and subsection (c), on request of a
> party in interest, and after notice and a hearing, the court shall convert a case
> under this chapter to a case under chapter 7 or dismiss a case under this
> chapter, whichever is in the best interests of creditors and the estate, for cause
> unless the court determines that the appointment under section 1104(a) of a
> trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  "Cause" for conversion or dismissal includes:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a
>      reasonable likelihood of rehabilitation;
> …
> (J) failure to file a disclosure statement, or to file or confirm a plan, within the time
> fixed by this title or by order of the court;

11 U.S.C. § 1112(b)(4).

At the time that PMB originally brought this Conversion Motion, the Court ruled

as follows:

> PNB is correct that the most recent amended disclosure statement is not
> sufficient to approve.  The next step will depend in part on the resolution of the
> Debtor's motion to amend Litt's judgment lien, *i.e.,* whether I limit Litt's lien to
> somewhat less than all of the properties.  If I do, the Debtor will have a source of
> assets that she can sell (or possibly refinance) as needed to provide the cash to
> fund a plan.  If I do not, she could start to liquidate properties to set up a fund to
> "bond" the appeal. Once there is sufficient money in that fund, Litt's lien could be
> removed from the remaining properties.
> Either way, it is clear that properties will have to be liquidated (or possibly
> refinanced) in order to provide the liquidity necessary to confirm a plan of
> reorganization.  If the Debtor is willing and acts expeditiously to do so, then "a
> reasonable likelihood of reorganization" remains.  If not, then, I may need to
> appoint a trustee or convert this case.
> I am not eager to do so, given the substantial equity the Debtor has in this
> real estate.  PMB, CNB and Litt all have substantial equity cushions, so they are
> adequately protected at this time. They would not be the ones that suffer the
> costs of a liquidation.  (Litt's  interest in the conversion of this case arises, at least
> in part, from his status as a defendant in one of the Debtor's lawsuits.  That is not
> an interest that the Court needs to protect.)  That being said, I will not allow this
> case to remain pending until the resolution of one or more of the Debtor's
> lawsuits (which will probably take years), so real progress on the liquidation or

refinancing of real property must be made in the short term.

.…

Tentative ruling:  Continue motion to trail the disclosure statement and motion on Litt's lien.  If the Debtor has not made progress towards liquidating or refinancing properties to fund a *confirmable* plan of reorganization in three months, reconsider granting the motion.

(Tentative ruling, February 18, 2014 hearing on Conversion Motion.)

Now it is almost two-and-a-half years later and the Debtor has simply not made the real progress demanded by the Court.  While the Debtor has made progress in liquidating some Properties, she has not succeeded in doing so in a way that presents even the outline of a confirmable plan of reorganization.

This is a complicated case for an individual debtor.  The sale of the 1033 Properties (which was most of the Properties) triggers tax liabilities. The Debtor's existing tax liabilities are complex, and the assessment and an appeal of her 2006 state tax liability has been pending for the duration of this case. The effect of the FTB's assessment on federal tax lability is also not yet clear.  Litt's lien on the Debtor's Properties has substantially increased the difficulty of selling or refinancing Properties as the basis of a plan of reorganization.  The malpractice litigation cases may be the source of significant funding, but the resolution of these cases is still well in the future and (as the Court noted in the February 2014 tentative ruling quoted above and has repeatedly reminded the Debtor) the plan cannot await the outcome of these lawsuits. At best, the first one (McClure v. Tidus concerning alleged malpractice in the judgment obtained by Litt) is scheduled to go to trial in February 2017.  Assuming that this happens, it will still likely be months or years before a final judgment and this would most likely only compensate for the $1+ million excess fee award to Litt and not provide substantial amounts of cash into the estate.  The malpractice action against Litt and the

accountant(s) has been stayed by the Superior Court and there is still discovery to be

taken and other pretrial matters.  There is no trial date set, but there is a status

conference next month and McClure hopes to lift the stay at that time.

Thus, use of litigation proceeds to fund a plan is difficult, and may be impossible

in a nonconsensual plan of reorganization.  These complications have led the Court to

give the Debtor a substantial amount of time in Chapter 11: this case was filed on

December 21, 2012.

However, these same complexities mean that this case requires the retention of

competent, experienced bankruptcy counsel, which the Debtor has been unable or

unwilling to do on a consistent basis – despite the Court's very clear direction. To

emerge successfully from chapter 11, the Debtor needed an overall strategic plan that

would result in a confirmable plan of reorganization. Instead, the Debtor's approach

seems scattershot and lacking strategic planning. A good example of this is the choice

of Properties to be sold to fund a plan.  The Court restricted Litt's lien from virtually all of

the Properties to only enough Properties to cover his lien with at least a 100% cushion.

This was done so that the Debtor could refinance or liquidate the other Properties to

fund a plan. The Court let the Debtor choose which Properties would remain subject to

Litt's lien and the Debtor chose the three Corbett ones. A year later, she proposed a

plan that depended on the refinance or sale of Corbett. This plan was patently

unconfirmable, in part due to Mr. Litt's lien on the Corbett Properties.  Prior to the June

7, 2016 hearing on this Third Amended Plan and Disclosure Statement, the Debtor

switched tacks again - informing the Court that she would not be selling Corbett, but

would amend her plan to sell Hewitt. (Dkt. 1052 at 3:18-4:4.) The Debtor believes Hewitt

is a better choice, because it does not have positive cash flow and there has been a

surge in downtown LA Arts District pricing.  She now seeks to list Hewitt for sale. Selling

Hewitt may be the right decision, but all of the reasons to sell Hewitt existed while the

Debtor was formulating her Third Amended Plan that was *based on the sale or*

*refinance of Corbett*.  Thus, the Debtor wasted time and money formulating a plan

based on a sub-optimal choice of Properties to sell/refinance.  Further, the decision to

sell Hewitt came so late that the Debtor is currently unable to provide PMB with any

proposal for the treatment of its claim and has lost the opportunity to obtain PMB's

support.

This case has a substantial cost to the estate.  Debtor's various bankruptcy

counsel alone have incurred fees well in excess of $300,000 (Supp. Memo. [Dtk. 1069]

at 10:9-21; D.S. [Dkt. 1016] at 13-14.)  The Debtor's tax professionals and malpractice

litigation counsel add another layer of cost.  Furthermore, the Debtor's operations

appear to be cash negative.  So the estate is not only incurring substantial legal fees

during this case, its operations also drain the estate.  Based on the information in the

Debtor's recent Current Property Value Charts (dkt. 1052; "Property Charts") five of the

Debtor's remaining Properties generate negative cash flows, while the remaining five

Properties' operations are slightly cash positive. Once the expenses for property

insurance and one-time major repair and maintenance events are taken into account,

the Debtor's Properties as a whole are cash negative.  (Unless otherwise noted, all

information for the following analysis is taken from Property Charts (dkt. 1052).  Figures

are by the year and are frequently rounded.)


Cash Negative Properties

- **Hewitt** is generating a deficit of about **$7,000**/year. Tenant paid rent of $61,800. Meanwhile, contractual interest to the (oversecured) lender accrues at $47,100 (although debtor is currently only paying $34,800 in adequate protection, the remaining interest must be paid from the proceeds of this asset ahead of unsecured creditors), real estate taxes are $12,300, HOA fees are $6800, and maintenance not covered by HOA is $2800. (The current tenant has departed and this property is to be listed for sale.)

- **Honoapiilani** generates about **$30,000**/year negative cash flow.  The Debtor's monthly operating reports for the periods of June 1, 2015 – May 31, 2016 report less than $10,000 in rental receipts from this Property over that year-long period. (Rental income was not reported by the Debtor in the Property Charts.) Yearly expenses total $40,700: $15,800 for HOA, $5,900 in taxes, $15,500 of interest, and $3,500 for maintenance (not including $11,000 spent in 2015 for new air conditioning).

- **Otsego** and the **Invitational Lot** are unoccupied, generating no income, while collectively incurring about **$8000**/year in taxes.

- **W. Gregory** is not included in the Debtor's Property charts, but must also be a cash drain on the estate, as it earns no rental revenue, generates tax and maintenance expenses, and is subject to an oversecured PMB deed of trust, which accrues post-petition interest that the Debtor is paying. (Dkt. 1016 at 36.)

Cash Positive Properties

- **Harrington** generates positive cash flow of approximately **$9,000**/year.  Rents are $32,400, while taxes are $5,400, interest to oversecured PMB is $15,500, and maintenance is $2,700 (not including $10,000 of major repairs in 2015).

- **Dalmatian** generates positive cash flow of approximately **$8,000**/year.  Rents are $32,400, while taxes are $6,100, interest to oversecured PMB is $15,500, and maintenance is $2,500 (not including $7,000 of major repairs in 2016).

- **Invitational** has generated positive cash flows of about **$10,000.**  Rents are $21,600, while taxes are $7,300, HOA is $1,500 (some of which may be apportioned to the Invitational lot), and maintenance is $2,400 (not including $3,000 to replace the furnace in 2015, plus unknown amounts to repair roof and resurface driveway).  (Although the tenant is leaving at the end of July.)

- The three Properties on **Corbett** generate the most positive cash flow – about **$34,000.**  Rents are $180,000, while taxes are $32,000, utilities, etc. are $31,200, interest to oversecured PMB is $79,100 and maintenance is $3,800 (not including $16,000 - $30,000 for new windows needed this year, as well as an unknown amount for two new front doors also needed this year).

Taking these figures together, the Properties generate approximately $16,000/year in positive cash flows, taking into consideration rental income, taxes, maintenance, HOA fees, and interest to oversecured lenders.  Property Insurance expense, which the Debtor projects at about $11,000/year (Disc. Stmt. [Dkt. 1016] at 88) reduces this positive cash flows from operations to $5,000/year. One-time major maintenance expenses - which have been experienced by five of the Properties in 2015 or 2016 and which total $47,000 -$61,000 (depending on the cost of the Corbett windows) mean that the Debtor's operations in 2015 and 2016 should actually deplete

the estate by approximately $18,000 to $25,000 each year. (This is without considering

the expenses of the Debtor's residence on W. Gregory or the possibility of lapses in

tenancy.)

The (presumably best case) projections in the Debtor's Third Amended

Disclosure Statement support this analysis and the Court's concern over cash flows.

The projections show the Properties generating net cash flow of approximately $21,000-

$25,000, but with the Shellpoint loan negatively amortizing (the proposed payments to

Shellpoint are about $25,000 to $33,000 less than the interest accruing on the loan).

Given the extensive professional fees and the negative cash flow from

operations, the Court is very concerned over the cash flow from this estate and feels the

estate would benefit from a third-party trustee looking over and managing the estate's

sources and uses of cash. The large cash flow deficits from Honoapiilani and Hewitt

strongly suggest that the Debtor is not sufficiently monitoring and considering cash

flows from the Properties.  If the prior two-and-a-half years of revenues and costs for

Honoapiilani were similar to the past year analyzed above, Honoapiilani alone drained

over $100,000 from the estate during the course of this case.

(The chart in Litt's opposition to the Debtor's motion to use the proceeds of

Rossmore also supports this concern: it shows that the Debtor has received about

$1.35 million in net proceeds from property sales. (Dkt. 1073 at 4:4-14).  However, it

appears that the Debtor now holds only about $500,000 in cash (based on $287,000 of

Rossmore proceeds, $132,000 cash in the May 31, 2016 monthly operating reporting,

and $94,000 still in escrow for Riverside).

The tenor of the Debtor's argument at the June 7 hearing was troubling.  A

continuing theme to her arguments was that her situation was more dire than the

objecting creditors were representing. This is consistent with her approach to PMB at the last meeting (as reported by PMB): she cannot even tell PMB how she plans to treat its claim. In other words, the Debtor appears to believe – despite the Court's repeated statements that she needs to file a facially feasible plan of reorganization and repeated deadlines to do so -  that further difficulties alone will buy her more time in chapter 11. And buying more time in bankruptcy appears to be her only strategy.  In fact, she once again asks for a continuance of the motion to convert so that her (possible) new bankruptcy attorney can be paid a retainer and hired.   Unfortunately, at this late stage in this chapter 11, she needs to be presenting solutions to those difficulties and a strategy for reorganization.  Having consistently failed to present a strategic plan to address her difficulties, the Debtor has lost the confidence of the Court and her creditors. Furthermore, the Debtor's creditors have been willing to deal with Debtor's bankruptcy counsel, but have little to no confidence or willingness to negotiate with the Debtor directly.

The Court is and has been sympathetic to the situation that Ms. McClure finds herself in.  Litigation and appeals take time and money.  She is fearful that a trustee will settle with Litt and Tidus, which will not only reduce any recovery which she believes she is entitled to but will also leave her without the satisfaction of a judgment that their actions damaged her.  She would like to hold on to as many of her properties as possible, particularly given the many years of litigation that it took to recover damages from Long Beach.  She would like to be paid the $5,000 per month to work as a paralegal on this case. (Dkt. 1068, 4:12)

However, given the Debtor's inability to file a facially feasible plan by the (repeatedly extended) deadline set by the Court, the creditors' lack of confidence in the

Debtor, the Debtor's unwillingness to consistently retain counsel adequate to the task, and the diminution to the estate from the incurrence of professional fees and negative cash flows from the Properties, grounds for conversion under both §1112(b)(4)(A)&(J) have been shown.

Appointment of a Trustee

As the Court noted two-and-a-half years ago (as quoted above) and as is even more true today, there is substantial equity in the Properties, which should not be squandered in a hasty liquidation.  Furthermore, there may be reasons to remain in chapter 11 a while longer before confirming a plan of reorganization.  The three broad categories of work left to do for this estate are: (i) finalize IRS and FTB 2006 assessments and obtain an understanding of their impact, (ii) pursue the malpractice litigation, and (ii) formulate and confirm a plan to use the Properties to pay creditors and then effectuate that plan.  While it has been clear from the beginning that a plan cannot await resolution of the malpractice litigation, it is quite possible that it should await resolution of the state and federal 2006 tax assessments. It is the Court's understanding that the FTB 2006 assessment was based on both (i) the disallowance of the 1033 election and (ii) the disallowance of $1 million of attorneys' fees. If the IRS did a piggyback assessment disallowing the 1033 election, the Debtor would have an enormous 2006 tax liability, but the Properties would not be 1033 properties and their sale would generate far less tax liability.  Given the equity in the Properties, it may be worthwhile to await final 2006 assessments before determining how best to use the Properties to pay the claims of the creditors. But given the loss of confidence in the Debtor by the Court and creditors, for all of the reasons discussed above, the Court

regretfully concludes that the Debtor is no longer the correct party to operate the Debtor in the interim or to move the plan process forward.

There is also a need to use the cash in the estate to best advantage.  Paying multiple retainers to hire even more attorneys and accountants may be the right thing to do … or maybe not.  Paying fees for past work by professionals needs to wait until an independent entity (here a trustee) can analyze whether this could end up as an administratively insolvent estate.  If so, these chapter 11 administrative expenses should not be paid at this time.

Section 1112(b) allows this Court to appoint a trustee as an alternative to conversion if "the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  I have concluded that appointment of a trustee would be in the best interests of this estate and its creditors, because the estate would benefit from the comparative flexibility of chapter 11 (as discussed in the preceding paragraph) and the services of a trustee carefully selected by the U.S. Trustee, rather than one that is randomly assigned (as would occur if converted to chapter 7 at this time).  It will take time and expertise to carefully analyze the tax situation, the Properties, and the viability of the malpractice litigation.

The Court believes that this estate would most benefit from a trustee who could gain the confidence of the Debtor and work well with a strong client who has managed these Properties for a long time and knows them well.  While it may not ultimately be necessary or even desirable, the Court hopes that the Trustee will carefully analyze what contributions Ms. McClure could make to the handling of her assets.

It may be, after careful consideration of the probability of success in the malpractice lawsuits and the cost to the estate of obtaining that success, that settlement

of these lawsuits is in the best interests of the estate. It is hoped that the trustee will carefully analyze the contributions of each of the professionals and determine the most efficient and effective way to move forward with the pending and future litigation.

Although the Court is well aware of one or more panel trustees who would be capable of carrying out these actions effectively, it is also aware that the US Trustee may go outside the panel and the Court would fully support the US Trustee doing so in this case if that would yield the best result.

**Ruling:**  The Court will order the appointment of a Chapter 11 trustee, and the motion will otherwise be denied.

###

Date: July 12, 2016

_____
Geraldine Mund
United States Bankruptcy Judge