FILED & ENTERED

OCT 23 2018

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Shirley Foose McClure<br><br><br><br><br><br><br><br><br><br>Debtor(s). | Case No.: 1:13-bk-10386-GM<br><br>CHAPTER 11<br><br>**MEMORANDUM OF OPINION ON (1) MOTION OF JOHN P. REITMAN, CHAPTER 11 TRUSTEE, FOR ORDER APPROVING SETTLEMENT WITH BARRETT S. LITT, ET AL. PURSUANT TO FED. R. BANKR. P. 9019 [dkt. 1344]; (2) MOTION BY DEBTOR TO COMPEL ABANDONMENT OF STATE COURT LITIGATION CASE BC443404 [dkt. 1355]**<br><br>Date:        March 27, 2018<br>Time:        9:00 AM<br>Courtroom:  302 |

    Two motions are pending before this Court.  They have overlapping issues and thus will be dealt with jointly.

<u>The Motions</u>:

John Reitman, chapter 11 trustee (the "Trustee") for the estate (the "Estate") of Shirley McClure[1] (the "Debtor"), moves for approval of a settlement between the Trustee and Barrett Litt and affiliated parties (the "Litt Parties").  This motion (the "Motion to Settle") concerns the state court malpractice action brought by McClure, Superior Court BC393584 (the "Litt State Court Action"), which includes malpractice claims for advising the Debtor and her son to make an IRC §1033 election for the majority of their settlement funds and to invest in various real estate rental properties pursuant to that election.  It also would resolve all pending appeals by Litt from orders of this court. [dkt. 1344]

Shirley McClure filed a motion to abandon (the "Motion to Abandon") the state court malpractice action that she brought against Jeffrey Tidus, et. al, Superior Court BC443404 (the "Tidus Case.").  In the Tidus Case, McClure is contending that Tidus committed malpractice in defending her against the fee claim of Litt, et al., thus resulting in a judgment of over $11 million. [dkt. 1355]

Background:

I have been the judge assigned to Ms. McClure's cases since her initial filing in 1992.  The following summary is the best of my memory with some basic review of the dockets.  This is meant to provide a framework as to the structure of the cases. McClure has laid out specifics from her prospective in her summary of her case-in-chief, which is discussed in much greater detail below.

1:92-bk-13717-GM ("1992 Case"): In January 1992, McClure filed her first chapter 11 case.  At that time she was involved in federal court litigation with the City of Long Beach ("Long Beach Litigation"). I believe this was concerning a zoning issue which prevented her from using her property for her business, but I could be wrong as to the basis of that litigation.  She quickly confirmed a Plan that provided for 100 percent payout upon a successful conclusion to the Long Beach Litigation.

---

[1] The identification of "McClure" refers only to Shirley McClure.  When it is necessary to specifically identify Jason McClure, he will be referred to as Jason or Jason McClure.

During the years prior to at least 2007, McClure worked in Litt's office, serving as a paralegal on her cases. I do not recall whether she was paid or not for these services and/or whether she performed other work for Litt (not connected with her own cases). This is one of the issues in both the Litt State Court Action and the Tidus Case. Until June 2007, she was represented by Litt in both the Long Beach Litigation and in the 1992 Case.[2]

The Long Beach Litigation eventually settled for an amount in the range of $20 million, some of which McClure invested in about eighteen parcels of real property, all or most of which she has leased to third parties. Her son Jason McClure, also a co-plaintiff in the Long Beach Litigation, is or was a 5 percent owner in some or all of these properties.

Once the Long Beach Litigation settled, McClure was able to proceed with amending her confirmed Plan and moving the 1992 Case toward consummation, a final decree, and closure.

In 2007 McClure substituted in for Litt, representing herself in the 1992 Case.[3] Then in April 2008, Robinson, Diamant & Wolkowitz substituted in for McClure and proceeded to file claims objections and move the confirmed Plan toward substantial consummation. In January 2009 that firm filed a motion to withdraw on the basis of nonpayment of fees.[4]

At some time before 2008, a fee dispute arose between McClure and Litt. On April 3, 2009, Litt filed a final application for compensation in the amount of $9,097,265.25 fees and $990,592.06 expenses. The fee application stated that Litt had already received $9 million from McClure and he sought an additional sum per the Order approving the Fourth Amended Disclosure Statement Describing the First Post Confirmation Chapter 11 Plan entered on March 12, 1998.[5] In April 2009, the Court

---

[2] Barrett Litt changed law firms several times after the initial 1992 case was filed. The name "Litt" is meant to include any claim that he had either individually or as a member of such firm(s).
[3] 1992 Case, dkt. 53. She also substituted herself for Thomsen Young, dkt. 54.
[4] 1992 Case, dkt. 56, 121, 134.
[5] 1992 Case, dkt. 124, et seq.

entered its order allowing Robinson, Diamant & Wolkowitz to withdraw as McClure's attorney and shortly thereafter Jeffrey Tidus and his firm of Baute & Tidus, LLP took over representation of McClure in the fee dispute.[6]

The Litt fee dispute moved forward.  The OUST objected to the initial fee distribution without prior court approval.  At the hearing on August 12, 2009, I issued my tentative ruling in favor of Litt, which was followed by an order granting his compensation application.[7]  Under that Order, Litt obtained a judgment for $1,104,503.57 unpaid fees and expenses and an abstract of judgment in this amount was issued by the court.[8]

Tidus, on behalf of McClure, filed a motion to reconsider, which was denied after an extensive legal battle.[9]  McClure took a timely appeal.[10]

While the appeal was pending at the district court, the parties fought over whether the Litt judgment should be stayed pending appeal and what use, if any, McClure could make of properties subject to Litt's abstract of judgment.  In January 2010, McClure was once again representing herself, but by March of that year she had engaged the firm of SulmeyerKupetz to represent her in the stay litigation.[11]

In April 2011, McClure brought a motion for final decree in the 1992 Case (her second attempt), which was denied.  In August 2013, through Greenberg & Bass (which apparently now represented her), she again sought a final decree, which was once again denied.

---

[6] 1992 Case, dkt. 134.  Tidus began filing papers on June 10, 2009 (dkt. 137), but I find no Order to employ on the docket. His firm's first appearance was representing McClure in her opposition to the Robinson motion to withdraw.  That was filed as "Attorneys Specially Appearing for Reorganized Debtor" [dkt. 122].  The Tidus Firm continued to represent Ms. McClure throughout the fee dispute with Litt and that representation is the basis of the Tidus Case.

[7] 1992 Case, dkt. 144, 146.  Dkt. 144 contains a summary of the arguments, as well as the Court's tentative ruling.

[8] 1992 Case, dkt. 154.  A motion to stop perfection was filed, but denied.  Dkt. 155, 156.

[9] 1992 Case, dkt. 150 et seq., dkt. 182.

[10] USDC 2:09-cv-09400-GW

[11] The docket in the 1992 Case is not clear when one firm exited, another firm entered, or McClure acted pro se.  It does show a variety of motions and oppositions were filed by different people at various times, so the Court is extrapolating general dates.

Meanwhile the struggle went on between McClure and Litt as to the use of the properties subject to the Litt abstract [the "Litt Lien"].  In October 2014, McClure hired Faye Rasch as her special bankruptcy counsel, to assist and advise McClure, who would "maintain control of her Chapter 11 Cases, and file documents in pro-per."[12]  The Court allowed this in the 1992 Case and in the 2013 Case.

On August 16, 2016, McClure received her discharge and the 1992 Case was closed.

### 1:13-bk-10386 ("2013 Case" or "Current Bankruptcy")[13]

On December 21, 2012, McClure filed a new chapter 11 bankruptcy case in the Los Angeles Division of the court, which was the proper venue.  Because of the prior case, the Current Bankruptcy was quickly transferred to the San Fernando Valley Division and given the case number of 1:13-bk-10386-GM.  Greenberg & Bass filed the petition on her behalf and was representing her in both the 1992 Case and the Current Bankruptcy.

The Current Bankruptcy case has been dominated by eight ongoing issues:

(1) McClure's need to use the rents of her various properties (cash collateral) to make mortgage payments, maintain the properties, pay taxes, and provide herself with a salary as the manager of these properties;

(2) The time that it took for a final determination by the Ninth Circuit Court of Appeals as to the appeal by McClure of the Litt judgment;

(3) The existence of Litt's lien on most of the real properties, the amount of equity needed to protect him, his wish to be paid forthwith, and his desire to encourage (force?) McClure to drop the superior court malpractice lawsuit, etc. against him (the Litt State Court Action);

---

[12] 1992 Case, dkt. 268

[13] Although the Current Bankruptcy was actually filed in December 2012, because of the divisional transfer it has a 2013 prefix.  To avoid confusion, the identification "2013 Case" is used.

(4) The desire of City National Bank ("CNB") and Pacific Mercantile Bank ("PMB") to be paid on their mortgages;

(5) The time that it took for a final determination by the Franchise Tax Board ("FTB") as to whether McClure could claim the benefits of IRC §1033;

(6) McClure's hesitancy to release control to qualified bankruptcy counsel who could take her through the whole process;

(7) McClure's attempt to keep as many properties as possible, regardless of their net cash flow;

(8) McClure's serious health issues.

During the Current Bankruptcy, McClure has hired and fired several attorneys. Greenberg and Bass and Faye Rasch continued for a while to assist her in both cases. She hired Robert Scholnick as special counsel to deal with tenant damage and eviction matters. This was later expanded so that he also represented McClure in the Litt State Court Action.[14]  Wood, LLP was hired as special tax counsel to deal with the IRC §1033 issues.[15]  In September 2013, McClure hired Peter M. Kunstler, Esq. to represent the estate in the various state court actions.[16]

During the first year of the case, 300 matters were docketed.  McClure, through the Greenberg & Bass firm, filed a Disclosure Statement and a First Amended Disclosure Statement, she listed and/or sold some out-of-state properties, and she hired special counsel and accountants to deal with a variety of issues.  Litt opposed many of the motions when they impacted properties on which he had a judgment lien or the general proceeding of the case or of the Litt State Court Action.

The secured creditors kept up their pressure and in the second year of the case, McClure reluctantly started listing California properties for sale.  She sold a few.  In August 2014, Greenberg & Bass was substituted out as attorney for the debtor-in-possession and McClure began representing herself.[17]  She immediately employed the

---

[14] 2013 Case, dkt. 217
[15] 2013 Case, dkt. 169, 258
[16] 2013 Case, dkt. 254
[17] 2013 Case, dkt. 435

Farley Law Firm ("Farley Firm") as special litigation counsel to handle the state court matters. Kunstler's role terminated, and Scholnick's was greatly reduced.[18] This demonstrated the Debtor's decision to change course from a mediation legal team to a legal malpractice trial team.

In September 2014, McClure, representing herself, filed a "preview" of a Second Amended Disclosure Statement. During this period some of the issues of McClure's son Jason being a co-owner were resolved and the Santa Monica property was sold and the proceeds were used to protect other properties.

In trying to handle Litt's lien, which the Court believed tied up an excessive amount of equity, the Court valued the properties - leaving some subject to the lien, but removing the lien from the remaining properties.[19] Year two ended with another 260 matters added to the docket.

During year three, McClure continued to represent herself with the assistance of Ms. Rasch.[20] The additional 275 docket entries in year three represent continued sales of properties, motions by the mortgage creditors for relief from stay or other issues, objections by Litt, and a series of appeals by him to the district court. The Court decided that the Plan needed to wait until resolution of the two major issues: the appeal to the Ninth Circuit as to whether Litt was entitled to the additional $1.1+ million in attorney's fees and a determination of the appeal of the Franchise Tax Board ruling denying the IRC §1033 claim. Meanwhile, the OUST started to seek an order appointing a trustee or converting the case due to incomplete or inaccurate monthly operating reports. During the months that followed McClure and the OUST were able to work out some of the problems which had been caused by the complexity of McClure's income and expenses for the various Properties in the Estate.

---

[18] 2013 Case, dkt. 448, 475
[19] 2013 Case, dkt. 533, 558
[20] In November 2014, McClure sought an order to employ Faye Rasch as special bankruptcy counsel in both the 1992 Case and the Current Bankruptcy. Ms. Rasch was not to control either case, but merely to advise Ms. McClure, who continued to represent herself and the Estate. 1992 Case, dkt. 267; 2013 Case, dkt. 517

As year four was about to begin, McClure employed Weintraub & Selth as her general bankruptcy counsel.[21]  In April 2016, while the FTB appeal was still pending, McClure (through Weintraub & Selth) filed a new Disclosure Statement and Plan; this was amended on May 3, 2016.[22]  On May 17, 2016, Ms. McClure substituted herself in as attorney in place of Weintraub & Selth.[23]  By July 2016, it was clear that the FTB obligation would likely exceed $1 million.[24]  The Litt Judgment had been affirmed by the Ninth Circuit,[25] so the two major hopes for a surplus case had vanished.  On July 12, 2016, the Court granted, in part, the motion by PMB (which had been filed in January 2104 and trailed as McClure attempted to reorganize) and instructed the OUST to appoint a chapter 11 trustee.  Shortly thereafter John P. Reitman was appointed as trustee.[26]

The appointment of the Trustee focused some issues.  More properties were sold, a determination of the status of the remaining properties was made, litigation of the many Litt appeals to the district court went forward, and secured creditors were dealt with.

When the district court determined that this court needed to revalue the properties to ascertain the amount of equity available for Litt's lien in that the recent Ninth Circuit decision in *New Investments, Inc.* now allowed default interest even under a confirmed Plan, the Court began that process.[27]  Meanwhile, the Trustee and Litt had a continuing series of settlement discussions, often delayed due to a health issue of the Trustee.  They finally reached an agreement, which Ms. McClure (though her new limited appearance counsel Michael G. Spector) opposes.

---

[21] 2013 Case, dkt. 841, 861
[22] 2013 Case, dkt. 999, 1000, 1016, 1019
[23] 2013 Case, dkt. 1029
[24] 2013 Case, dkt. 1080
[25] 1992 Case, dkt. 285, Mandate filed Jan. 22, 2015
[26] 2013 Case, dkt. 327, 1089, 1090, 1113
[27] 2:15-cv-02745, dkt. 13; 2013 Case, dkt. 1184; *Pacifica L 51 LLC v. New Investments, Inc. (In re New Investments Inc.)*, 840 F.3d 1137 (9th Cir. 2016).

### TRUSTEE'S MOTION TO SETTLE WITH THE LITT PARTIES

After recapping the Litt issues in the 1992 Case, the Trustee summarizes the events in the Current Bankruptcy as follows:

Debtor filed this case for Chapter 11 relief on December 21, 2012.  The bulk of her estate's assets were comprised of her interest in multiple parcels of income producing residential real estate in Southern California, San Francisco, Maui, Indiana and Michigan (the "Properties"), most of which were IRC §1033 Properties and owned 95% by the Debtor and 5% by her son Jason.  The major claims against the Estate were (i) approximately $460,000 in unsecured claims; (ii) secured lender claims of CNB, PMB its affiliate PM Asset Resolution, Inc., and Shellpoint Mortgage Servicing for Bank of New York, as trustee, each secured by deeds of trust on various real estate, (iii) Litt's lien on most of the Properties, and (iv) a $1,317,047 priority tax claim by the FTB. As the debtor-in-possession, the Debtor sold several Properties, using the money to repay some of her secured debt (CNB was paid off in full), for repairs and maintenance on other Properties, and to pay other expenses of the Properties and of this Chapter 11 case.  Litt filed objections to most or all of these sales and filed appeals to the district court when his objections were overruled.

On April 2, 2015, the Court entered an order limiting the Litt Lien to three Properties located at 910 Corbett St., Nos. 1, 2 and 3, San Francisco, CA.  Litt appealed this order (the "Litt Lien Appeal") to the United States District Court, where it was assigned to Judge Wu and consolidated with related appeals that the Litt Parties had taken from the Court's orders (collectively, the "Litt Appeals").  In March 2017, the District Court remanded the Litt Lien Appeal for further consideration of the Ninth Circuit Court of Appeals decision in *New Investments, Inc.*

The Trustee

Since his appointment in July 2016, the Trustee has taken a number of actions to administer the assets of the Estate.  He reached a court-approved Closing Agreement

with the Franchise Tax Board, resolving the Debtor's dispute with the FTB over the validity of the Debtor's §1033 election. He obtained court authorization to sell two properties in Michigan that were unencumbered but not operating on a net cash flow positive basis. He reached a settlement with PMB (the "PMB Settlement"), which is expected to result in the reduction of PMB's secured claim by at least $650,000. The Court entered an order, following notice and a hearing, approving the PMB Settlement. The Debtor objected to the PMB Settlement and appealed the Court's order approving it (the "McClure Appeal"). The Trustee elected to have the McClure Appeal heard by the district court and it has also been assigned to Judge Wu.[28]

The Trustee believes that the PMB Settlement is a key step on the road to proposing and funding a Plan of reorganization. However, the PMB Settlement provides that PMB's claim must be paid in full by June 30, 2018, which requires sale of the Estate's properties in San Francisco, Southern California (other than the Debtor's residence in Fullerton), and Hawaii. In January 2018, the Court approved the Trustee's retention of brokers to market and sell these Properties.[29]

The Proposed Settlement with the Litt Parties

The Trustee has reached a settlement with the Litt Parties, embodied in a settlement agreement (the "Litt Settlement Agreement"; Exhibit 1 to the Declaration of John Reitman), which provides for:

- the reduction of the $1.1 million Litt Lien on the Corbett Properties (by more than $800,000) to $340,000 (the "Litt Settlement Secured Claim"), plus interest thereafter at the federal post-judgment interest rate of 0.45%;

- release of the Litt Lien on all other Properties;

---

[28] 2:18-cv-00698. On May 21, 2018, Judge Wu affirmed. McClure appealed to the Court of Appeals (18-55753). That appeal is still pending.
[29] After the filing of this motion, the sale of the properties has closed and PMB has been paid in full under the PMB Settlement Agreement.

- dismissal of the Litt State Court Case (although not the claims of Jason McClure);

- dismissal of Litt's appeals;

- payment of the Litt Settlement Secured Claim upon the sale or refinancing of the Corbett Properties; and

- customary mutual releases.[30]

The Trustee is seeking approval of the Litt Settlement Agreement.  As discussed in the analysis section below, the Trustee argues that this proposed settlement with Litt is fair and equitable and should be approved under the standard set by the Ninth Circuit.

**Joinder of Litt Parties**

The Litt parties join in the Motion, and argue as follows:

The claims against Litt that the Trustee proposes to settle would not yield any real value for the estate.  The Debtor had repeatedly been offered the opportunity to settle with Litt under a 2006 Agreement[31] that would have limited Litt's fees to $9 million; the Debtor instead chose to go forward with claims against Litt – using a variety of attorneys and in circumstances that indicate the weakness of the Debtor's claims against Litt. The Litt State Court Action has been stayed since 2008 and is barred by *res judicata* (the debtor has litigated every claim she has against Litt in this Court) and the statute of limitations. In particular, the claims against Litt for allegedly deficient tax advice are weak. The Debtor retained other tax counsel before filing the tax returns in question and buying more §1033 properties.[32] The debtor's damages are limited: FTB has settled its claim for $800,000 in taxes and $288,000 in interest and the IRS has not filed a claim and the time to do so has passed.

---

[30] Since this motion was filed, Corbett was sold as part of the PMB Settlement and the Trustee is holding the proceeds of the sale of that and other properties.
[31] Apparently 1992 Case, dkt. 132-12
[32] The file does not contain a copy of the tax returns or the actual date of filing.  However, it is logical that these were filed between March and September 2007.

**Debtor's Opposition**

The Debtor has filed an opposition, arguing as follows:

As the Court has acknowledged, this will be a surplus case.  Thus, the settlement will be of no benefit to creditors (who will be paid in full anyway) and will affect only the amount of Debtor's recovery. At the November 28, 2017 hearing, in response to questioning by the Court, the Trustee's counsel stated that the Trustee's projections suggest that there would be a surplus.  The Court then stated that if the sale of the Properties did yield a surplus, then the Litt State Court Action could be an asset for the Debtor to keep and pursue.  This settlement would deprive the Debtor of the right to pursue these claims against the Litt parties, claims that the Court has said belong to the Debtor.

The Debtor's projections support the conclusion that this a surplus estate: the various properties are listed for sale by the Trustee at $6.8 million, while secured claims are only $2.7 million and the Trustee's latest report shows cash of $950,000.  On the other side, unpaid unsecured claims are $300,000 (without SulmeyerKupetz' disputed claim), the FTB is owed $1.1 million, and Litt's $1.1 million fee claim should be considered an offset against the Debtor's malpractice claim.  (Administrative claims have not yet been litigated, but Debtor's prior counsels have already been paid $240,000.)

The Debtor and Litt were close to a settlement of the Litt State Court Action shortly after it was filed in 2008, until Litt's malpractice carrier sued Litt for rescission. The Litt State Court Action has been stayed since 2009 - at the request of Litt – pending resolution of the Franchise Tax Board audit.

This Court's ruling and Judge Wu's affirmation of that ruling did not adjudicate the Debtor's claims against Litt, as Judge Wu expressly stated on the record at a July 8, 2012 hearing.

Since his appointment in July 2016, the Trustee has taken no steps to investigate the Litt State Court Action or Litt's disputed claims.  He has not interviewed the Debtor,

allowed the Farley Firm to conduct discovery or file an amended complaint, requested the litigation files, or hired replacement counsel for the Farley Firm (except the Makarem firm, which had a conflict of interest as it had previously been retained by the Debtor and her son).

The Debtor does have experienced professional malpractice counsel willing to take the Litt State Court Action: Arie Spangler, who estimates that she will need 7-8 months to prepare for trial, assuming that discovery is still open.

The Debtor's claims against the Litt Parties are meritorious.  The Farley Firm, which took the Litt State Court Action on a modified contingency basis in 2014, valued the litigation in the $10 million range.  The tax attorneys hired by the Debtor and her son, as well as the FTB, all concluded that Litt had committed malpractice.

If successful, the Debtor or the Trustee could recover against Litt.  He was a multi-millionaire even before he received $9 million from the Debtor's estate.  He has $3 million in litigation insurance and Arch's rescission action is still pending, awaiting the outcome of the Litt State Court Action.  At a minimum, a judgment against Litt could be offset against his $1.1 million claim.

To approve a compromise, the Court must make an independent determination that the compromise is reasonable, fair and equitable: it cannot merely rubber stamp the Trustee's conclusion.

To oppose a settlement, the Debtor must show that s/he is a "person aggrieved," *i.e.,* directly and adversely affected pecuniarily. This can be shown where there is a reasonable possibility of a surplus in the case. This Court has already acknowledged that this is a surplus case and that the Litt State Court Action accordingly belongs to the Debtor.  In contrast, this settlement is not in the paramount interest of the unsecured creditors, because they will be paid in any event.

Furthermore, the Trustee has presented no evidence that he has made a substantive review of the merits of the Litt State Court Action, such that he could make an "informed judgment after diligent investigation."  Nor has he presented any facts to

allow this Court to determine whether the settlement falls above the "lowest point in the range of reasonableness."  Nor has the Trustee presented any evidence that a judgment against Litt would not be collectible.

**Rulings on Litt Objections to Evidence**

The Court hereby makes the following rulings on the Litt Objections to Evidence:

Shirley McClure Declaration – overrule all objections

Robert Wood Declaration (ex. B, ex. D) – overrule

Harold Winnett Declaration (ex. C) – overrule.  It is clear from the complete declaration that it refers to a meeting held on or about 2/27/07.

Robert Wood Declaration (ex. O) – sustain as it appears to be unsigned, however, this is a copy from 2008 and is part of something larger.  There may be a signed copy somewhere.

**Reply by Trustee**

The Court has made no finding that this is a surplus estate, but was speaking hypothetically.  The Trustee's counsel did not represent that the Estate is "unequivocally" surplus, but only that the Trustee's good faith projections show that a surplus is possible. On March 22 the Trustee will file the analysis requested by the Court in its email.  Without the sale of the Debtor's current residence and/or the settlement with Litt, it is likely that it will not be surplus.

The Motion contains four pages of analysis of the claims in the Litt State Court Action.  The Opposition is unsupported by admissible evidence and the documents that she attaches do not support her arguments:  Litt did not admit that he committed malpractice, but he stated that he sought the advice from a tax attorney, who later represented the Debtor directly.  The assertion that Litt was the architect of the §1033 program will be hotly litigated in the state court trial.

The damages are also questionable since the §1033 election does not eliminate taxes, but merely defers them.

As to the involvement of the Trustee in the case, the Trustee did meet with the Debtor on August 18, 2016 and conducted an extensive interview with her at that time, including the issues of the Litt State Court Action.  The Trustee, in consultation with the Farley Firm, decided not to proceed to discovery since the Litt State Court Action was stayed and Debtor's health and the ongoing settlement discussions meant that to go forward with discovery would not be in the best interest of the Debtor or the Estate. There was no need to have the Farley Firm turn over the litigation files since that firm represented the Trustee until it withdrew.

The Trustee agrees that difficulty in collecting a judgment is not a significant issue.

**Reply by Litt Parties**

There has been no determination that this is a surplus estate and that determination cannot be made until all of the professionals have filed their fee applications and had their fees allowed by the Court.  The amount of income taxes would also need to be determined.  If McClure wins on her appeal of the PMB settlement, the Estate could end up owing $650,000 more.  She has done nothing to dispute the SulmeyerKupetz claim.  And her assertion that Litt's claim is disputed is incorrect since it has been determined by a final judgment.

The settlement provides an immediate benefit to the estate of over $800,000. Also the Court has never determined that the Litt State Court Action belongs to her rather than to the Estate.  Although Litt does not and has not agreed that he is liable to Ms. McClure, he is willing to reduce his secured claim by over $800,000 to buy peace.

Further, there is no factual support for most of McClure's brief.

///

///

1  **Additional Information as to the State Court Action**

2      Because the only information at hand for the Court as to the Litt State Court

3  Action was the description by the parties in their papers, on April 23, the Court emailed

4  the following to the parties:

5      I am continuing to work on the decision in the McClure case on the motion to
       settle with Litt and the motion to abandon the Tidus case.  There are a few
6       documents that would be of great help.

7
       1.  The currently effective state court complaint in the Litt case - BC393584 - and
8      any pending motions to amend
       2.  The currently effective state court complaint in the Tidus case - BC443404 -
9      and any pending motions to amend
10     3.  To the extent that it is different, the state court complaint in the Tidus case
       prior to the dismissal of the cause of action to amend the Litt complaint pending
11     in the state court.  [Please note that I do not understand why this is [in] the Tidus
       case, but that is what the motion to abandon specifies.]
12     4.  The Farley email of 5/2/16 that is described in the Motion to Compel
       Abandonment on p. 9 lines 8-13.
13
14     To the extent that these have been previously filed, feel free to direct me to those
       documents by docket and page number.
15
16     I do not need more than a single copy of each.  I suggest that you work out who
       will send what to me.  I would appreciate these by the end of this week.  Be sure
17     to copy everyone with what you send.  Please email them to me at the address of
       this email.
18
19     Thank you.
20
21     Both parties complied with this request and the documents that they provided are
22
23  on the case docket as #1389 and #1390.
24      A brief summary of the issues in the Litt State Court Action is as follows:
25      The complaint was filed in July 2008 and both Shirley and Jason McClure are the
26  plaintiffs.[33] It asserts that Litt used undue influence to force McClure to sign a check to
27
28  ---
    [33] Although the McClures (mother and son) are co-plaintiffs in both the Litt State Court Action and the Tidus Case,
    Shirley McClure is clearly in charge and thus this memorandum refers to "McClure" even if it is obvious that it is

him for $9 million and also a release agreement that he prepared without giving

McClure a chance to read it or consult with independent counsel.  This occurred in

August 2006 (the "2006 Agreement").  Litt gave McClure improper advice as to the

administration of the Chapter 11 case so he should not have been paid the $9 million

and McClure was forced to hire Robinson, Wolkowitz & Diamant to mitigate the

damages.  Also, he gave improper advice as to the settlement of the Long Beach

Litigation and this required her to hire Robert Wood to mitigate that damage. In

summary, she seeks a return of the $9 million, rescission of the 2006 Agreement, and

other compensatory and punitive damages.

In April 2009, Litt filed his application for fees in the bankruptcy court, based on

the terms of the April 28, 1998 amended plan.  While that was pending, McClure moved

to amend the Litt State Court complaint.[34]  The amended complaint would greatly

expand the factual allegations of wrongdoing, such as inducing McClure to work at his

law firm for over 23,000 hours and seeking fees for this in the amount of $4 million even

though he only paid her $360,000.  While representing Shirley, Litt also conducted an

"inappropriate relationship with her that lasted over 12 years."  She also contends that

Litt committed malpractice in the terms of the settlement of the Long Beach Litigation.

And she then goes on to assert the issues as to the IRC §1033 properties.[35]  It is

possible that there will be a further motion to amend to add additional issues  of breach

of fiduciary duty due to business relationships of Litt and McClure that are conflicts of

interest and breaches of various contracts with the McClures such as the leases for

properties owned by the McClures.[36]

On August 12, 2009 the bankruptcy court ruled on the Litt fee application and -

because the 2006 Agreement was after the confirmed amended Plan - the bankruptcy

---

meant to include Jason as well as Shirley McClure.  However, the proposed settlement does not include the rights
of Jason McClure.

[34] 1992 Case, dkt. 124; 2013 Case, dkt. 1389-2.

[35] This is only a brief summary of the allegations contained in the proposed first amended complaint.  For the
actual allegations see 2013 Case, dkt. 1389-3, p. 5, et seq.

[36] 2013 Case, dkt. 1390, p. 1-2.

court deferred to the superior court on those issues and limited its ruling to the terms of the amended plan.[37]  On November 5, 2009, Judge Bendix stayed the Litt State Court Action and also the motion to file a first amended complaint.  In her tentative ruling she raised various concerns as to the timing of the motion, but did not rule on those.[38]

Thus, what remains in the Litt State Court Action are the potential questions of possible damages for malpractice as to attorney-client relations, intentional infliction of emotional distress, and malpractice as to bad tax planning advice.

**Additional Information Presented to the Court by the Trustee**

At the hearing on March 27, 2018, Mr. Reitman, the Trustee, gave additional testimony under penalty of perjury concerning the amount of work that he had done to ascertain the facts needed to determine whether to settle and at what amount.  This included meetings with the Farley Firm, a meeting with Ms. McClure, and a review of documents.  In brief, he stated that he had received and read detailed analyses from the Farley Firm as to the status of the case, the strengths and weaknesses, the expected costs to go forward, and the probability of success.  He reviewed the documents provided by McClure, Litt, and the Farley Firm and determined that this would be a complicated litigation and would be very expensive to pursue.  He was also concerned that Ms. McClure would make a poor witness.  As to McClure agreeing to a settlement, he believes that she is inflexible and would not agree to anything other than a judgment against Litt.[39]

While he did not elaborate on his attempts to find a lawyer, he did state that he had been unable to locate one other than Makarem, who McClure herself had felt was qualified, but then she objected to his employment by the Estate.  He noted that no discovery had been taken in the Litt State Court Action.

---

[37] 1992 Case, dkt. 144, 146, 179, 182.
[38] 2013 Case, dkt. 1389-6. P. 33, et. Seq.
[39] 2013 Case, dkt. 1386

Thus, when he evaluated all of the information, he came to the conclusion that the probability of success was questionable, as were the amount of damages.  All of these items went into this conclusion that the proposed settlement is fair and reasonable under the circumstances.

Mr. Spector objected to the timing of the Trustee's testimony because it was presented at the hearing and not in the pre-hearing papers.  At the time, the Court did not specifically rule on this objection.  Mr. Spector did not request a continuance to present further evidence based on the Trustee's testimony, although he did ask to see the communications from the Farley Firm, to which Trustee's counsel objected as privileged communications.  The court did not rule on this, either.

**Rulings on McClure Objections to Trustee Testimony and Demand to See Farley Firm Communications**

The testimony given by the Trustee at the March 27, 2018 hearing did not raise any issues other than those already set out in the Motion or the Reply.  They expanded the information in the Reply, but did not include specific facts that McClure could have investigated.  There were no surprises.  Thus, the objection to that testimony is overruled.  Had it been sustained, at best the hearing would have been continued so that McClure could file a sur-reply to that testimony.  But there was nothing new that she had not already covered.

As to the communications between the Trustee and the Farley Firm, the Trustee has properly invoked attorney-client privilege.  The Court has struggled a bit due to the unusual circumstance that it was Ms. McClure, while serving as debtor-in-possession, who hired the Farley Firm to represent the Estate and, to the extent that this would be a surplus estate, she would also be a direct beneficiary of their services.  However, she is no longer the representative of the Estate.  That duty has fallen to the Trustee.  And the Estate, as represented by the Trustee, is the client of the Farley Firm.  The issue of privilege is made theoretically complex because the firm that the Trustee consulted is

the same one that originally represented the Estate when McClure was the debtor-in-possession.  Had he hired a new firm and received privileged communications from them, there would be no question that neither the Debtor nor any other party would be entitled to them unless privilege is waived by the Trustee.  And the Court finds no difference just because the Farley Firm continued to serve as counsel for the Estate in this matter.  Thus, the request for documents provided by the Farley Firm to the Trustee is denied.

**Modified Evidentiary Review**

Given the nature and complexity of this case and the many issues raised by McClure, the Court decided to do a modified evidentiary review as to her case-in-chief.

At the request of the Court, Ms. McClure filed a summary of her prima facie case concerning her state court complaint against Mr. Litt.[40]  She entitled this as a "Request for Judicial Notice," a designation to which Litt objected.  The Litt objection is technically sound.  The Court is not taking judicial notice of the content of this document, but realizes that it is merely a statement of expected evidence.

As instructed, McClure divided her proffer into liability and damages.

Review of Liability Issues as presented by McClure and modified by the Court to the extent that the court files contain specifics on which the Court can take judicial notice (as reflected in the footnotes)

McClure and Litt have had a long and involved relationship.  According to the chronology provided by McClure, Litt was brought into her Long Beach discrimination case at the end of 1992 as co-counsel to Bidna and Keys.[41]  At that time the bankruptcy

---

[40] Los Angeles Superior Court BC393584 ("state court case" or "superior court case")
[41] McClure et al v. City of Long Beach, 2:92-cv-02776, filed 5/7/1992 ("Long Beach case"),

case was already in progress (having been filed on June 1, 1992) and the initial version of a Plan and Disclosure Statement had been filed.[42]

Within months after Litt's entry into the Long Beach case as co-counsel with Bidna & Keys, McClure began to work in Litt's office on a temporary basis, which was meant to last through discovery and depositions. She was to be paid pursuant to a written agreement.  The compensation was tied to the amount that McClure was obliged to pay the RTC in order to keep her Culver City house and was to rise as the payments to the RTC increased.  According to McClure, she was soon working at least 80 hours a week and her pay was approximately $2,500 per month.  It is not clear but it seems that at that time she was working solely on her own case rather than for the benefit of other clients of Litt, though at some point she provided him with office administrative services.

By late Spring 1993, Litt became McClure's sole counsel in the Long Beach case. In June 1993 the Chapter 11 Plan was confirmed.  There was no provision for payment of attorney fees, but Dennis Johnston had been employed by the bankruptcy court as limited counsel and as part of that employment application there was an agreement with McClure that on the successful conclusion of the Long Beach case, he would receive $200 per hour for work done starting on April 28, 1992.[43]  Similarly, although Bidna & Keys had been employed by the bankruptcy court as special litigation counsel in August 1992, their contingency agreement was not reflected in the initial Plan.[44]

Immediately after confirmation, Litt was employed as Special Litigation Counsel in place of Bidna & Keys in the bankruptcy to pursue the Long Beach litigation.  No specifics of the Litt fee arrangement were set forth.[45]  When Dennis Johnston withdrew as bankruptcy counsel in July 1993, Thomsen Young of Pachulski, Stang, Ziehl &

---

[42] 1:92-bk-13717, filed 1/29/1992 (hereafter "1992 Case").  Originally this case had a paper docket.  The electronic docket started with #1 on 2/21/1995 and therefore there are duplicate numbers.   Thus, for example, the Notice of Order Confirming Chapter 11 Plan was docketed as #56 on the paper docket and #3 on the electronic docket.
[43] 1992 Case, dkt. 18, 19, 43 (paper docket)
[44] 1992 Case, dkt. 24 provides for a 33 ½%- 40% fee if settled and a 40% fee if there is a late settlement or a trial. (paper docket)
[45] 1992 Case, dkt. 45 (paper docket)

Young P.C. ("Pachulski" or "the Pachulski firm") substituted in as general bankruptcy counsel.[46] [McClure raises the issue that the Pachulski firm was never employed by the court and that it merely filed a substitution of attorney.  This is correct, however, once a Plan is confirmed, although some attorneys do file an employment application, it is not absolutely necessary for a new attorney to be "employed."] At this same time, Litt's employment in the bankruptcy case was expanded so that he also became special counsel to pursue some other adversary matters.[47]

Starting in 1995, the business relationship between McClure and Litt deteriorated.  Litt refused to increase her pay to meet the RTC demands and her Culver City house was foreclosed on.  Litt had apparently agreed to provide a lease elsewhere, but failed to do so.  McClure asserts that she was working 80-100 hours per week for the same low salary of about $2,600 per month.[48]  By summer 1996, Litt told McClure that he no longer needed her assistance in his office since he increased his office staff and he gave her enough money to move to Michigan to live with her son Jason.

From late August through November 1996, McClure returned to Los Angeles at the request of Litt to assist in organizing the documents in her case. Then Litt asked her to stay in L.A. and continue to work on her case for a year during which he would hire competent staff to take over the case and that he would have her work part-time and attend the UCLA Paralegal Certification program in the mornings.  She did so, earning her Paralegal Certificate in Litigation and Corporations in late Spring 1997.  She then resumed her 80-100 hours per week working on the Long Beach case.  She claims that Litt agreed to make up the salary shortfall if she won the case or would pay for her to go to law school.

The original confirmed Plan had been based on the belief that the Long Beach case would be resolved in a year or so.  As the years dragged on, it became apparent that the Plan must be modified to deal with issues concerning the EMC and others.  Part

---

[46] 1992 Case, dkt. 46 (paper docket)
[47] 1992 Case, dkt. 47 (paper docket)
[48] This is not a typographical error in that she used the figure $2,500 in one place of $2,600 in another.

of the final modification, approved by order entered on January 25, 1999, specified an apparently new formula for Litt's fees.[49]  Thomsen Young worked on this and McClure did the paralegal work.  Once the modification was approved, Thomsen Young ceased work on the bankruptcy and on the Long Beach case.

In 2001, Litt tried to contract with someone to manage the trial preparation and trial work of the Long Beach Litigation.  When he was unsuccessful, he offered the job to McClure, who accepted and the Litt-Galahad Litigation Support Services Company was formed.  This consisted of McClure, a band of mostly part-time college students, and later Jason McClure (who joined at Litt's request).

Having been delayed for over a year from its scheduled start date, the trial against Long Beach finally took place some 12 years after the case was filed.  In August 2004, the jury returned a $20 million judgment in favor of McClure and a $2.5 million one in favor of Jason.

When the award was made, Litt immediately retained a tax attorney at Allen Matkins to advise him and his personal accountant how to treat the McClures' anticipated award.  McClure was not aware of this.  In mid-August 2006, the Long Beach case settled and the settlement checks were received. There is a question raised about the inclusion of protective language in the Long Beach settlement papers. McClure states that Litt agreed to remove some protective language from the settlement papers – at the demand of Long Beach – but did this without the knowledge of the McClures.

While waiting for the settlement, McClure provided litigation support services through Galahad to a Pasadena attorney who represented Tom Goldstein on a false imprisonment case.  Litt was brought in as trial attorney and obtained an $8+ million settlement, but McClure asserts that she was never paid her $175/hr fee.

---

[49] The Court does not have the original terms of employment, but the one approved by the Court in the modified Plan is the basis of the later fee application, award, and appeal.  It is tied to the amount awarded as fees and costs in the Long Beach case. 1992 Case, dkt. 83, 90, 144

The bulk of McClure's case-in-chief deals with the decision to use the settlement money to purchase real properties under the IRC §1033 election.  McClure asserts that the written communications with Thomas Henning of the Allen Matkins law firm demonstrate that it was a close question whether §1033 would apply and that, if she made this election, she was sure to be audited.  McClure asserts that Litt did not tell her that using §1033 was a high-risk strategy.  She also contends that although Henning told Litt that she would have to allocate the settlement among McClure's claims and pay proportional taxes on the recovery percentage of each claim, Litt did not tell her this but saidthat she would have to take the election on the entire $9 million that went to her.

As to other options, Henning told Litt that she could just take the award as capital gains, since she did not take losses in 1991 from her taxes for the Long Beach damages.  Instead Litt told her that her only option was the §1033 exchange or she risked losing almost all of her settlement recovery.  However, if she had taken the capital gains option, she would have paid about $2.7 million in taxes and would not have faced an audit or been tied up in this very high-risk tax strategy.

At first Henning was solely Litt's counsel.  But later Litt gave him permission to assist McClure and to jointly represent both Litt and McClure.  Henning sent Litt a list of four possible accountants for McClure and she selected Harold Winnett.  Before she met with either Winnett or Henning, Litt had "demanded" that she elect under §1033 and he had had his own accountant file the election on Rossmore and Santa Monica (tax year 2005) and the Michigan properties (tax year 2007).  McClure did not meet with Winnett until February 2007 (and it is not clear that she met with him then).

In May 2007, McClure hired Loeb & Loeb to represent her in a variety of issues including her business dealings with Litt.  This apparently lasted only a few months.  After that McClure told Litt that she had no tax attorney and he advised her to hire Robert Wood, which she did starting in August or September 2007.  By that time, McClure had purchased Rossmore, Santa Monica, Otsego, Invitational, and Hi Lo; was

in the process of purchasing Benton 3 &4; and was entering escrow on a commercial building in Fontana.

Another issue that has arisen concerns the fees paid to Litt.  There was some major blowup between McClure and Litt on August 29, 2006.  McClure refers to it as "the incident" or a "very ugly incident" and gives no details.  But the details are bound to come out on cross-examination.  The Court can only surmise that she would testify that tempers were high and that she unwillingly gave in to Litt's demands.  McClure contends that Litt told her to deposit the settlement check at City National Private Banking Division in Beverly Hills, but he had arranged to have a power of attorney over that account.  When McClure found out about the power of attorney, she closed that account, opened a new account and made the deposit.  Nonetheless, McClure asserts that she was forced by Litt to sign a $9 million disbursal check to Litt and a one-page agreement in August 2006, both of which were done without Litt seeking court approval. Thereafter Litt claimed that he was owed more and that McClure could make this up by sharing title to the §1033 repurchase properties.  She also asserts that Litt demanded that he be made the sole beneficiary of her will and that he hired an attorney to accomplish this.  Apparently when these demands were not agreed to by McClure, Litt filed his fee application seeking the additional award based on the fee provisions as set forth in the Amended Chapter 11 Plan.  This was granted by the Court and affirmed by the Ninth Circuit Court of Appeals, resulting in a judgment and judgment lien of roughly $1.1 million.

There is also an issue of the amount of malpractice insurance carried by Litt. McClure argues that he has an undisputed amount of $2 million, but an additional $1 million is being held back by the insurance company subject to litigation since it asserts that he falsified his application in August 2007 for that increase.  At the hearing on August 6, 2018, Litt's counsel stated that this was incorrect and that the entire $3 million

is in issue and part of the lawsuit by the insurance company.  The Trustee assured the

Court that he was aware of this matter when he entered into the settlement agreement.

McClure is seeking general and punitive damages.

The Court has not allowed Litt or the Trustee to file any argument or evidence in

response to this.

**Analysis**

The defining case concerning settlements is that of *Protective Committee for

Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88

S.Ct. 1157, 20 L.Ed.2d 1 (1968), which mandates that a bankruptcy court apprise itself

"of all facts necessary for an intelligent and objective opinion of the probabilities of

ultimate success should the claim be litigated. Further, the judge should form an

educated estimate of the complexity, expense, and likely duration of such litigation, the

possible difficulties of collecting on any judgment which might be obtained, and all other

factors relevant to a full and fair assessment of the wisdom of the proposed

compromise. Basic to this process in every instance, of course, is the need to compare

the terms of the compromise with the likely rewards of litigation." 390 U.S. at 424.

This mandate by the Supreme Court requires that the Court determine whether a

compromise pursuant to Fed. R. Bankr. P. 9019 is "fair and equitable." *In re Woodson*,

839 F.2d 610, 620 (9th Cir. 1986).  The Court evaluates the fairness, reasonableness

and adequacy to the estate under the factors articulated by the Ninth Circuit:

In determining the fairness, reasonableness and adequacy of a proposed

settlement agreement, the court must consider:  (a) The probability of success in

the litigation; (b) the difficulties, if any, to be encountered in the matter of

collection; (c) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; (d) the paramount interest of

the creditors and a proper deference to their reasonable views in the premises.

*In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. Cal. 1986), *cert. denied sub nom.,*
*Martin v. Robinson*, 479 U.S. 854 (1986).  The Court should review the issues and
determine whether the settlement falls below the lowest point in a range of
reasonableness.  *In re Teltronics Service, Inc.,* 762 F.2d 185, 189 (2nd Cir. 1985);
*Spirtos v. Ray (In re Spirtos),* 2006 Bankr. LEXIS 4894 at *32 (B.A.P. 9th Cir. May 19,
2006).  Courts reviewing a proposed settlement generally accord deference to the
Trustee's business judgment, although the Trustee has the burden of persuasion that
the settlement is fair and equitable and should be approved. *Goodwin v. Mickey*
*Thompson Entm't Group* (*In re Mickey Thompson Entm't Group),* 292 B.R. 415, 420
(B.A.P. 9th Cir. 2003).

The Court is not required to hold a full evidentiary hearing or a mini-trial before it
can approve a compromise.  The Court need only canvas the issues to see if the
settlement falls below the lowest point of reasonableness.  10 Collier on Bankruptcy,
16th Ed., ¶ 9019.02, citing *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493
(Bankr. S.D.N.Y. 1991) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.), cert.
denied sub nom. 464 U.S. 822, 104 S. Ct. 89, 78 L. Ed. 2d 97 (1983)); *In re Doctors*
*Hospital of Hyde Park, Inc.*, 474 F.3d 421, 428–30 (7th Cir. 2007).


In essence, the proposed settlement gives up the estate's claims against Litt –
valued by the Debtor at $10 million - in exchange for an $800,000 reduction in Litt's
secured claim.  The Trustee argues that probabilities of success in the Litt State Court
Case and the complexity, inconvenience and delay in litigating it support approval of this
compromise.  Regarding complexity, the Debtor asserted numerous claims based on a
wide variety of (sometimes conflicting) factual allegations. Litt has asserted various
defenses to these claims. (These claims, factual allegations, and defenses have been
considered by the Trustee and are detailed in pages 9-11 of the Motion.) Regarding the
probabilities of success, the difficulties in litigating the Litt State Court Case include the
staleness of the matter (which has been stayed since 2009), the need for testimony

from the Debtor (who is in ill health and may not be able to fully participate), and the

Trustee's lack of counsel (after the Debtor opposed the employment of Ron Makarem

and contacted Mr. Makarem directly, the Trustee has not been able to find counsel).

Thus, while a jury might prove sympathetic to Ms. McClure (and there appear to be no

difficulties in collection), the Trustee has made the business judgment that there is

substantial risk that the Estate might not prevail in the Litt State Court Case and the

interests of the Estate are best served by the Litt Settlement Agreement (which also

resolves the Litt Appeals and allows the Trustee to focus on effectuating the PMB

Settlement and formulating a Plan to bring this bankruptcy case to conclusion).

Before analyzing the four requirements that the Trustee must meet, the Court

needs to deal with McClure's allegations that (i) the Trustee has not duly investigated

and pursued the Litt State Court Action and (ii) there is a reasonable possibility that this

will be a surplus estate.


1. <u>Did the Trustee Duly Investigate and Pursue the Litt State Court Action?</u>

The Trustee has not retained counsel to prosecute this matter and the Debtor

alleges that the Trustee has not truly investigated the merits of the Litt State Court

Action (*i.e.,* that he neither reviewed the case files nor interviewed the Debtor).  It

should be noted that although the Trustee states that he held a long meeting with the

Debtor soon after he was appointed, he also indicates that this covered many topics

and the Litt issues were only a part of those. And as to making an independent review

of the files, while the filed papers only allude to his prior attorney and there is no

showing as to whether he has actually made an independent determination (or had an

expert review the files), his sworn in-court testimony fills in these gaps.

As to the failure to employ new counsel, the Trustee made at least one attempt –

Mr. Makarem – which was blocked by Ms. McClure.  There may well be other available

attorneys and should the Court deny this motion to settle, the Trustee will have to find

such a firm.  But at this time, there are other factors which weigh heavily in determining whether the Trustee is exercising his business judgment in a fair and reasonable way.

Litt and the Debtor have each argued the merits of the Debtor's claims against Litt (as described above).  In the Motion, the Trustee discusses the difficulties of the litigation, but does not state any judgment on the merit of the underlying claims.  The motion seems to rest more on the possible amount of recovery if McClure were to prevail in the Litt State Court Action.  To make such recovery worthwhile in comparison to the settlement, she would have to obtain a judgment of an amount substantially greater than $800,000 since some of the judgment would be needed to pay attorney fees for the Estate's state court counsel as well as the future administrative costs which would accrue in defending against the district court Litt Appeals and any appeals that Litt would file in the Ninth Circuit or in the state court system.

Of course, actual fees cannot be determined at this time, but as to the Litt State Court Action, the proposed fees for the Makarem Firm were to be between $225 and $295 per hour (depending on the experience of the attorney) and a contingency of 20% of the total amount recovered.  The estate would have to recover a judgment of at least $1 million, just to equalize the contingency fee against this settlement.  And it is certain that there would be many hours of discovery, motion practice, trial preparation, and the trial itself (besides post-judgment and appeal work).  Although the Court does not have a crystal ball, it is not hard to imagine at least 500 hours of attorney work, totaling some $125,000 in combined hourly fees and maybe much more.  Thus, it seems that the estate would have to obtain a judgment of at least $1,125,000, just to match the settlement proposal.  This figure is exclusive of fees that would be incurred in the current district court appeals and any future state or federal court appeals.  And there is no certainty that the estate will prevail at all.

///

///

///

## 2.  The Reasonable Possibility That This Will Be a Surplus Estate

If the sale of the Properties - together with existing cash balances and any recovery from the Tidus Case - would yield a surplus estate, then this settlement will not affect creditor recoveries since the creditors would be paid in full in any event. If so, the settlement would not be in the "paramount interests of creditors." It would only affect the Debtor's recoveries and she is opposed to the settlement.  And, if the Debtor pursued the litigation, then the cost, difficulty or uncertainty of litigation are irrelevant to the Estate. Thus, if it appears likely that the Estate will be surplus, the Court will not approve this proposed settlement, absent some other compelling reason to do so.[50]

While the issue of the reasonable possibility of a surplus estate is a bit murky, the weight of the facts supports the Trustee and not Ms. McClure.  The Court requested that both parties give it spreadsheets on this issue.[51]  At the hearing, Litt's counsel (who inadvertently had not been included in or aware of this request) made extensive comments, as did counsel for the Trustee and for McClure.  Based on the information provided and my own analysis, I cannot find that there is a reasonable possibility that this will be a surplus estate. Set forth in the "Surplus Calculation" section and the Surplus Calculation Chart below are my findings on this issue: in short, a $1,218,241 deficit even if the Litt lien is totally disallowed in the Litt State Court Action.

While this deficit was calculated without considering any recovery from the Tidus Case, which the Court finds is too difficult to predict, it is not reasonably possible for the Tidus Case and the Litt State Court Action to provide damages of some $3.6 million that would be needed to totally wipe out the Litt lien and also create a surplus estate for the purposes of this Motion to Settle and the Tidus Motion to Abandon.

Since it is not reasonably possible that this will be a surplus estate, the Court must take into consideration the effect of the proposed settlement on the other stakeholders including unsecured claimants and administrative claimants.

---

[50]  For instance, the Trustee repeatedly states the importance of effectuating the PMB Settlement, but never directly states that this settlement is necessary to effectuate the PMB Settlement, which settlement has been completed since the filing of this motion.

[51] 2013 dkt., 1458, 1472, 1474

1

2    3.    <u>The Settlement Meets the Reasonableness Requirements</u>

3        There are four steps that the Court must review in determining whether the

4    proposed settlement can be approved as being fair, reasonable, and adequate:

5

6    <u>Probability of success</u> – Based on McClure's submission of her summary of her case-in-

7    chief and a review and judicial notice of facts properly taken into evidence, the Court

8    has prepared a detailed analysis of liability and potential damages.  Because of the

9    state court litigation as to Litt and as to Tidus, the Court feels that it is improper for its

10   analysis (based solely on the Debtor's evidence and argument) to be publicly available.

11   The analysis is contained in a separate document and is being filed under seal

12   concurrently herewith and is incorporated by reference herein.  Should there be any

13   motions based on my under-seal facts or analysis, they must also be filed under seal

14   and the same distribution limits will be placed on those filings.

15       As set forth in detail in the document under seal, I have concluded that overall

16   success is not a certainty or even a high probability.

17

18   <u>Difficulties in collection</u> – Although it appears that Litt's malpractice coverage is

19   questionable, both parties agree that there are no such difficulties.

20

21   <u>Complexity of litigation and expense, delay and inconvenience</u> – The document under

22   seal discusses the various issues that would occur in the state court trial.  The state

23   court litigation will include many boxes of documents, assertions of whether Litt is

24   responsible for the advice, and calculation of damages.  These are all time-consuming

25   and expensive matters.  Little or no discovery has taken place and that will also be

26   expensive and time-consuming.  Whatever the results, there will certainly be appeals,

27   causing more expense and delay.  This bankruptcy case has been pending for five

28   years and will be delayed by many more years if there is a state court trial.

1

2      The paramount interest of the creditors and their reasonable views – At this

3  point, the Trustee is the representative of the creditors.  While the Debtor's desires are

4  usually not considered, here McClure has an interest if she can recover enough to pay

5  all creditors in full, since the excess will be hers.  But she also has an individual

6  grievance against Litt – rightly or wrongly – and is not willing to let go of that.  From

7  what the Court has seen, she would gladly drag this out many years in the hopes of a

8  judgment against Litt that would not only give her money, but also provide her with a

9  sense of retribution and justice.  The Court wishes that these cravings could be fulfilled,

10  but given the timing of this case and the large amount of the settlement terms, it is

11  simply not in the best interest of the Estate and its creditors to roll the dice and let the

12  Litt State Court Action and the various current and future federal court appeals (which

13  are also draining on the Estate) and future state court appeals go forward.

14

15

16

17  ### McCLURE MOTION TO ABANDON

18

19      This motion concerns the state court trial in McClure v. Tidus, LASC BC443404.

20  At the time that the motion was filed, the trial was scheduled to begin on March 26,

21  2018 (Judge Mark Mooney presiding), with a final pre-trial hearing set for March 16.

22  2018. [After that Judge Mooney continued the matter to July 16, 2018 and stayed it.]

23

24  ### The Motion

25      In the Motion to Abandon, Ms. McClure asserts the following:

26      There is no attorney for the Plaintiff in that the Farley Firm was relieved as

27  counsel on October 10, 2017 and no new counsel has been employed.  The Farley Firm

28  had been employed as special litigation counsel to the Debtor.

The Trustee has known since June 2017 that the Farley Firm would be withdrawing because of a conflict.  Nothing has been done by the Trustee.

McClure has been served with five motions in limine.

The fee agreement with the Farley Firm was $150/hour and 20% of the recovery. The total billing for their work through 6/21/17 was $22,450.50 fees and $5,271.40 costs – mostly to defend against the Tidus Defendant's motions for summary judgment heard on January 5 and 6, 2017 and to respond to the Defendant's discovery demands.  No litigation preparation has been done since the Trustee was appointed.

There is insurance coverage for the Tidus Defendants and they are being defended by their insurance carriers.  It therefore appears that a judgment against them would be collectible.

At the time of the motion for summary judgment (January 2017), Judge Mooney divided the plaintiff's claims into two parts.  Part 1 is her cause of action in the handling of the Litt fee motion.  That is going to trial.  Part 2 is the cause of action to amend the Litt complaint pending in state court – which was dismissed without prejudice as not being ripe since the Litt State Court Case was still pending.

At the time of the Disclosure Statement in April/May 2016, the Farley Firm estimated the damages at $10 million.[52]   However, the settlement proposal attached as exhibit 18 to the supplemental materials provided by McClure, which is clearly not admissible, estimates damages in the Tidus Case (exclusive of any for the Litt State Court Action) to be approximately $1,818,000.[53]

The Trustee does not want to pursue Plaintiff's claims in this case or the Litt State Court Action. The Trustee wants to settle with the Tidus Defendants for a much-reduced amount.

At this point, the motion goes into the issue of hiring Makarem.

Also there is an issue about hiring A. Lavar Taylor to complete the negotiations for a payout with the FTB and an upcoming five-year statutory deadline.

---

[52] 2013 Case, dkt. 1393, p. 7
[53] 2013 Case, dkt. 1390, p. 80.

The Debtor wishes the Tidus Case to be abandoned in that it is clearly burdensome to the Estate and is not being properly administered. Abandonment under 11 USC §554 is appropriate when the trustee delays in the administration of an asset. *Hyman v. Plotkin (in re Hyman)*, 967 F.2d 1316, 1321 (9th Cir. 1992).

**Opposition**

The Trustee is actively conducting negotiations with the parties in interest. Any agreement would be subject to court approval. Therefore the Trustee requests a continuance to conclude his negotiations.

Because the Trustee is negotiating a resolution, this case is not burdensome to the Estate. And it certainly is not of inconsequential value and benefit. Thus the statutory standard for abandonment has not been met.

Concerning the $10 million figure**,** that is the value placed by the Debtor for both the Tidus Case and the Litt State Court Action – not for the Tidus action alone. But she also indicates that the Tidus action has so little value that it should be abandoned.

The Debtor had hired the Farley Firm and the Trustee continued to act on the advice of that Firm. The Trustee is and has been fully aware of the bifurcated nature of the claim in the Tidus Case.

The May 1, 2017 settlement demand made by the Trustee was not a "fire sale" demand. The amount of this demand (which is confidential) was prepared after consultation with the Farley Firm. It took into consideration the Debtor's poor health which made discovery and prosecution of the case more complicated. Anyway, the Defendants did not make a meaningful response.

Once the Farley Firm withdrew, the Trustee retained the Makarem Firm. When the Debtor contacted Ron Makarem and threatened to object to his employment, that firm withdrew. Since then, the Trustee has continued to seek qualified counsel, but without success. Thus, the fact that the Estate does not have litigation counsel in the Tidus Case is due to a combination of the Debtor's interference with the Trustee's

efforts to retain the Makarem Firm and the difficulties that the Trustee has had in finding

suitably qualified counsel to replace the Makarem Firm.

It is premature to determine that this is a surplus case.  Hopefully it will be, but in

the meantime whatever value resides in the Tidus Case should be preserved for the

benefit of the Estate and not abandoned to the Debtor.


**Reply**

After the Makaram Firm withdrew, the Trustee never suggested another law firm.

The Trustee still has not prepared for trial.

However, if the case is abandoned, the Debtor will retain Aire Spangler to

represent her on a contingency basis and the Debtor will contribute up to 50% of the net

proceeds to the Estate if that is needed to pay creditors in full.

The Debtor then sets forth a calculation to show that this is a surplus estate.


**Evidentiary Review as to the Tidus Action**

The Court also decided to do a modified evidentiary review of McClure's

case-in-chief in the Tidus Case, as it directly impacts both this Motion to Abandon and

the surplus calculation relevant to the Motion to Settle.

In compliance with the Court's request, the parties filed copies of state court

papers.[54] The current complaint pending in the Tidus Case is the Second Amended

Complaint, filed in June 2016.  Both Shirley and Jason McClure are the plaintiffs.  The

complaint alleges that when settlement efforts with Litt failed, the Tidus Firm was hired

to pursue the malpractice claims in state court.  When Litt filed his fee application in the

bankruptcy court, the Tidus firm requested that McClure hire Ringstad & Sanders to

represent her in the bankruptcy matter.  Ringstad was also to seek disgorgement from

Litt of unearned fees.  Because of their malpractice, Litt obtained an additional $1.1

million in fees.  Beyond that, the defendants charged McClure unreasonable fees for

---

[54] Although some of the papers in the Litt response are duplicative of those in the McClure one, for ease, I will cite to the McClure response – 2013 Case, dkt. #1389.

their services.  She seeks compensatory damages and return of the fees that she paid to the Tidus Firm/Ringstad.

Judge Mooney has bifurcated the Tidus Case into two sections: the claims concerning the Litt claim for fees in the bankruptcy court and the claims for representation of McClure in the Litt State Court Action.  The claims as to the Litt State Court Action were dismissed without prejudice pending the outcome of the Litt State Court Action as no damages can be determined until that time.

I also asked McClure to file a summary of her case-in-chief in the Tidus Case.[55] In response, Ms. McClure filed a summary of her prima facie case against Tidus, which offers factual details underlying her malpractice and unreasonable fee claims set forth in the Second Amended Claim.[56]

## **Analysis**

Based on McClure's submission of her summary of her case-in-chief and a review and judicial notice of facts properly taken into evidence, the Court has prepared a detailed analysis of liability and potential damages.  Because of the state court litigation as to Tidus, the Court feels that it is improper for its analysis (based solely on the Debtor's evidence and argument) to be publicly available.  The analysis is contained in a separate document and is being filed under seal concurrently herewith and is incorporated by reference herein.  Should there be any motions based on my under-seal facts or analysis, they must also be filed under seal and the same distribution limits will be placed on those filings.

Ms. McClure argues that this is a surplus estate. If this were the case, the Tidus Case would not be needed to pay creditors in full and abandonment might be appropriate. However, as set forth in the "Surplus Calculation" section and the Surplus Calculation Chart below, the Court finds that if it approves the Litt Settlement and thereby reduces the Litt lien, the estate would have a deficit of approximately

---

[55] 2013 Case, dkt, 1521
[56] See 2013 Case, dkt. #1525.

$1,558,241 - without considering any recovery on the Tidus Case.  Thus, the disposition of this asset will affect creditor recoveries.

The reasonable expected value from the Tidus Case is discussed in the Court's analysis being filed under seal

Ms. McClure also argues that the Trustee's delay in administering this action is grounds for abandonment. I agree that there have been delays in administering this asset. I do not understand why it is taking months and months to find new counsel or why the settlement talks are taking so long. And I am concerned that the Trustee has a weak negotiating position since he clearly is not ready to go to trial. However, I cannot yet conclude that these delays are harming the estate. The fact that McClure has designated her new counsel and is ready to proceed with this case, if it is abandoned, vitiates the weakness of the Trustee's position.  Because Ms. McClure is truly dedicated to obtaining a recovery in this case, the defendants should be more amenable to settling at a fair amount at this time and thus avoiding protracted and expensive litigation.

The standard for abandonment of estate property is that it be "burdensome to the estate" or "of inconsequential value and benefit to the estate."  11 U.S.C. §554.  Ms. McClure has not established that the Tidus Case is burdensome to the estate or of inconsequential benefit or value to the estate.  The Court must deny this motion to abandon at this point.

The Court has waited for months so that the Trustee could advise it of the proposed settlement terms.  If this occurs, I can determine whether the proposed settlement is for fair value and within the sound business judgment of the Trustee and should be approved.  If the case does not settle or the Court rules that the proposed settlement will not be approved and the Trustee decides not to continue to prosecute it, at that time the Trustee or Ms. McClure can bring a motion to abandon. I can then review whether the Tidus Case is burdensome to the Estate or of inconsequential value or benefit and thus should be abandoned to McClure or otherwise turned over to her to prosecute.

1

2                                    **SURPLUS CALCULATION**

3      Case law defines a determination of whether this is a "surplus estate" by the

4   standard of "reasonable possibility."  *Las Cruces Country Club, Inc.,* 2018 WL 1631243

5   (Bankr. NM, 2018); *Lopez v. Specialty Restaurants Corp. (In re Lopez)*, 283 B.R. 22 (9th

6   Cir. BAP 2002); *Nangle v. Surratt–Sales (In re Nangle),* 288 B.R. 213, 216 (8th

7   Cir.BAP2003).

8      The Court requested that the Trustee and McClure each provide it with a

9   spreadsheet showing the expected assets and liabilities of this estate.  I then reviewed

10  each, as well as other figures in the docketed papers and considered issues raised in

11  oral argument.  This was done in June 2018 before the sale of property as part of the

12  PMB Settlement.  My analysis, which is set forth as the Surplus Calculation Chart, takes

13  those later actions into account, and reaches the conclusion that after the reduction of

14  the Litt lien the estate should be expected to have a deficit of at least $1,558,241.  The

15  major issues are as follows:

16     (1) While McClure assumes a large recovery from the Litt State Court Case, I find

17         that the settlement amount is fair and reasonable as discussed above as to the

18         Motion to Settle. Thus, for purposes of the abandonment motion, the Litt Lien

19         claim is included in this analysis at the $340,000 settled amount.

20         With respect only to the Motion to Settle, McClure would need to show a surplus

21         without giving effect to the Litt Settlement and before any recovery in the Litt

22         State Court Case (so that the estate is not taking any of the risks of her litigating

23         with Litt.)  Replacing the amount of Litt's claim under the proposed settlement

24         ($340,000) with the actual amount of his secured claims ($1,104,503) would

25         increase the estate's deficit by an additional $764,503.  And even if the Litt lien

26         were to be totally removed, there is still a deficit of $1,218,241.

27     (2) The issue of the McClure appeal of the PMB Settlement is confusing.  McClure

28         does not include any sums for PMB's default interest.  As to the default interest, I

do not think that her appeal is meritorious.  It was affirmed by the District Court

and is now pending in the Court of Appeals.  However, no stay has been given.[57]

But even if she were to prevail, PMB is an oversecured creditor and is entitled to

the simple interest provided for in the notes, which appear to be in the 6.25-6.75

percent range.  PMB is also entitled to its attorney fees, which would likely be an

amount in excess of that in the approved settlement.[58]  Since it is unlikely that

McClure will prevail on her appeal, the Court is using the net figures received by

the Trustee on sale of Dalmation, Harrington, and Corbett plus the refund by

PMB.  Hewitt and Honoapiilani (Maui) were listed for sale, but received no final

offers.  PMB has now been paid in full.

(3) McClure disputes the SulmeyerKupetz unsecured claim of $143,980, but has

never filed an objection to this claim or revealed to the Court the basis of her

dispute.  This lack of information is not a new issue as it has been raised by the

Trustee at several times in the past.  Without knowing Ms. McClure's basis for

objection, the Court cannot determine that the claim is less than $143,980 and so

includes that figure in the calculation.

(4) For purposes of discussion, the Court has also calculated what would happen if

McClure waived her homestead as to the house and that was also sold.  As

noted in the chart, that would net the estate an additional $17,000.

(5) The analysis in the Surplus Calculation Chart notes $2,057,000 of loss carry

forward, but does not include it as an asset. This was the amount of the loss

carryforward in July 2016.  This loss carryforward should be almost entirely

depleted, as the estimated tax liabilities on the sale of the $6.3 million of real

properties included in the Surplus Calculation Chart assumes the use of this loss

carryforward. But even if there were no taxes left to be paid, this would still not be

---

[57] 2013 Case, dkt. 1431; 2:18-cv-698; 18-55753
[58] 2013 Case, dkt. 1256, p.5 (differential interest of $975,158.09); 13-bk-1-386, dkt. 1284, p. 11 (attorney fees for $275,000)

a surplus estate in that it would have a deficit of over $200,000 without including

the Litt lien.

(6) This analysis does not take into consideration the continued accrual of

administrative claims.

(7) The Tidus Case was not given an expected value as an asset of the estate

because of the difficulties of valuation.


Thus, for the purposes of the Motion to Settle, the Court finds that if the Litt

Settlement Agreement were not approved, the estate would have a deficit of at least

$2,322,744 and most likely a substantially greater deficit (due to increased

administrative expenses). As discussed in the Court's analysis of the Tidus Case filed

under seal, the reasonable expected recoveries in the Tidus Case do not appear to be

sufficient to turn that deficit into a surplus.  Thus, the Court concludes that it is NOT

reasonably possible that this will be a surplus estate.  While the Debtor has an

emotional and psychological stake in the outcome of the Litt State Court Action, she has

no financial standing to assert.

The reasonably possible recovery to the Estate from the abandonment proposal

urged by McClure is insufficient to create a surplus estate. Thus, the Court concludes

that it is NOT reasonably possible that this will be a surplus estate.

| SURPLUS CALCULATION | | | | | | |
|---|---|---|---|---|---|---|
| Item | COURT FINDINGS | COURT COMMENTS | Debtor, dkt. 1474 | Comments | Trustee, dkt. 1472 | Comments |
| | | | Where actual sales took place, those figures are used instead of the Debtor's or Trustee's estimates | | | |
| CASH ON HAND | | | | | | |
| **CASH ON HAND per 7/31/18 MOR** | **$391,295** | $530.877 minus PMB Collateral on Riverside Drive Sale of $139,582. 2013 Case, dkt. 1245 | **$391,295** | | **$391,295** | |
| REMAINING REAL PROPERTY | | | | | | |
| For Hewitt and Honoapiilani, even though they did not sell, the Court uses amount they were listed for and deducts 8% for cost of sale. 2013 Case, dkt. 1323-4, 1323-5 | | | | | | |
| 510 Hewitt #102 | $445,700 | $1,595,000 minus 8% cost of sale minus Bank of NY (noted as Resurgent (BOA)) lien of $1,021,700. There is no current income and per the recent MORs, no payments are being made as the lien amount is growing. 2013 Case, dkt. 1323-5, 1474 | $445,700 | $1,595,000 minus 8% cost of sale minus Bank of NY lien of $1,021,700. 2013 Case, dkt. 1323-5, 1474 | $159,028 | $1,283,400 minus 8% cost of sale minus Bank of NY lien of $1,021,700. |
| Honoapiilani #102 | $400,200 | Lien paid in PMB Settlement, $435,000 net of selling costs at 8% | $400,200 | Lien paid in PMB Settlement, $435,000 net of selling costs at 8% | $381,800 | Lien paid in PMB Settlement, $415,000 net of selling costs at 8% |
| Debtor's home (Gregory) | $17,000 | Debtor has 50% interest.  If included would add $253,000 (1/2 of $550,000 minus 8% cost of sale).  From that deduct $150,000 homestead exemption and | $17,000 | Debtor has 50% interest.  If included would add $253,000 (1/2 of | $17,000 | Debtor has 50% interest.  If included would add $253,000 (1/2 of |

| SURPLUS CALCULATION | | | | | | |
|---|---|---|---|---|---|---|
| Item | COURT FINDINGS | COURT COMMENTS | Debtor, dkt. 1474 | Comments | Trustee, dkt. 1472 | Comments |
| | | $86,000 taxes.  Net to estate would be $17,000 | | $550,000 minus 8% cost of sale). From that deduct $150,000 homestead exemption and $86,000 taxes. Net to estate would be $17,000. Debtor does not dispute fmv of $550,000 | | $550,000 minus 8% cost of sale). From that deduct $150,000 homestead exemption and $86,000 taxes. Net to estate would be $17,000 |
| **TOTAL REMAINING REAL PROPERTY** | **$862,900** | | **$862,900** | | **$557,828** | |
| NET PROCEEDS FROM SALES OF REAL PROPERTY | | | | | | |
| 910 Corbett #1 | $260,422 | actual proceeds of sale exclusive of Litt settlement reserve | $260,422 | actual proceeds of sale exclusive of Litt settlement reserve | $260,422 | actual proceeds of sale exclusive of Litt settlement reserve |
| 910 Corbett #2 | $248,427 | actual proceeds of sale exclusive of Litt settlement reserve | $248,427 | actual proceeds of sale exclusive of Litt settlement reserve | $248,427 | actual proceeds of sale exclusive of Litt settlement reserve |
| 910 Corbett #3 | $240,665 | actual proceeds of sale exclusive of Litt settlement reserve | $240,665 | actual proceeds of sale exclusive of Litt | $240,665 | actual proceeds of sale exclusive of Litt |

| SURPLUS CALCULATION | | | | | | |
|---|---|---|---|---|---|---|
| Item | COURT FINDINGS | COURT COMMENTS | Debtor, dkt. 1474 | Comments | Trustee, dkt. 1472 | Comments |
| | | | | settlement reserve | | settlement reserve |
| 13621 Dalmation | $77,762 | actual proceeds after sale, taking into account paying Weintraub lien | $77,762 | actual proceeds after sale, taking into account paying Weintraub lien | $77,762 | actual proceeds after sale, taking into account paying Weintraub lien |
| 218 N. Harrington | $162,275 | actual proceeds after sale | $162,275 | actual proceeds after sale | $162,275 | actual proceeds after sale |
| **TOTAL NET PROCEEDS FROM SALES OF REAL PROPERTY BEFORE INCOME TAX** | **$989,551** | **Not reflected on 7/31/18 MOR. Taken from dkt. 1472** | **$989,551** | | **$989,551** | |
| LEGAL FEES TO PMB | $0 | Paid though PMB Settlement | | Not included; on appeal | $0 | Paid though PMB Settlement |
| PMB REFUND | $191,486 | 2103 Case, dkt. 1500; this is not reflected in the 7/31/18 MOR | $191,486 | The PMB Settlement is on appeal, but for purposes of calculation, I include the refund received | $191,486 | |
| NET ASSETS BEFORE INCOME TAX WITHOUT CONSIDERATION OF LITT LIEN | | | | | | |
| | **$2,435,232** | | **$2,435,232** | | **$2,130,160** | |

| Item | COURT FINDINGS | COURT COMMENTS | Debtor, dkt. 1474 | Comments | Trustee, dkt. 1472 | Comments |
|---|---|---|---|---|---|---|
| **TAX ISSUES** | | | | | | |
| Loss Carry Forward | $0 | Assumes that the $2,057,000 of carryforward (as of 7/16) has been exhausted by $6.6 million in sales of above-noted real property (which has very little tax basis). Even if a substantial amount of the carryforward remained, it could not offset the estate's deficit (below) | $2,000,000 | In 7/16, but Debtor does not know how many NOLs were applied to sales of properties in 2016 and 2017 to know what is available to be applied in 2018 | | |
| **ESTIMATED TAX LIABILITIES ON SALE** | **($919,419)** | Assumes that $2,057,000 of loss carryforward (as of 7/16) can be used to partially offset taxable gain from $6.6 million of property sales (noted above) | **unknown** | Not calculated. Debtor has to assume all taxes offset until she receives the information on basis, depreciation, recapture, AMT | **($919,419)** | Assumes that this is partially offset by net operating loss |
| **UNPAID ADMINISTRATIVE EXPENSES** | | | | | | |
| Although this is bound to increase, the Court cannot anticipate the amount or whether all administrative claims will be allowed | | | As to Landau Gottfried, the Chapter 11 Trustee, and Force 10 fees, Debtor has not seen the legal fees invoice and cannot comment | | | |
| Landau Gottfried | ($494,431) | | | | ($494,431) | |
| Chapter 11 Trustee | ($244,074) | | | | ($244,074) | |

-44-

| Item | COURT FINDINGS | COURT COMMENTS | Debtor, dkt. 1474 | Comments | Trustee, dkt. 1472 | Comments |
|---|---|---|---|---|---|---|
| Force 10 | ( $90,000) | | | | ( $90,000) | |
| Pre-Trustee professional fees | ($365,721) | | | Debtor does not know which, if any, administrative fees the Trustee will object to, so has no way to comment | ($479,080) | |
| **TOTAL ADMINISTRATIVE CLAIMS** | **($1,194,226)** | | **unknown** | | **($1,307,585)** | |
| **PRIORITY TAX CLAIMS** | | | | | | |
| **FTB negotiated settlement** | **($1,090,058)** | | **($1,090,058)** | | **($1,090,058)** | |
| **UNDISPUTED UNSECURED CLAIMS** | | | | | | |
| Gumbiner Savett | ($71,000) | | ($71,000) | | ($71,000) | |
| Home Depot | ( $4,277) | | ( $4,277) | | ( $4,277) | |
| Macy's | ( $1,855) | | ( $1,855) | | ( $1,855) | |
| Makerem & Assoc | ($22,000) | | ($22,000) | | ($22,000) | |
| T-Mobile | $0 | | $0 | | $0 | |
| Wells Fargo Bank | ($23,695) | | ($23,695) | | ($23,695) | |
| Wood LLP | ($169,626) | | ($169,626) | | ($169,626) | |
| Wood LLP | ($13,337) | | ($13,337) | | ($13,337) | |
| **TOTAL UNDISPUTED UNSECURED CLAIMS** | **($305,790)** | | **($305,790)** | | **($305,790)** | |
| **DISPUTED UNSECURED CLAIM** | | | | | | |
| **SulmeyerKupetz** | **($143,980)** | | **$0** | Disputed and not to be paid. | **($143,980)** | |

| | | | | Debtor will file an objection based on her assertion that SulmeyerKupetz breached its agreement with Debtor after bringing in Greenberg & Bass and actively worked to sabotage Debtor's proposed Plans | | |
|---|---|---|---|---|---|---|
| **TOTAL UNPAID UNSECURED CLAIMS** | | | | | | |
| | ($449,770) | | ($305,790) | | ($449,770) | |
| **TOTAL LIABILITIES BEFORE LITT SECURED CLAIM** | | | | | | |
| | ($3,653,473) | | ($1,395,848) | | ($3,766,832) | |
| | | | | | | |
| **NET ASSETS BEFORE CONSIDERING LITT SECURED CLAIM** | | | | | | |
| | ($1,218,241) | | $1,039,384 | | ($1,636,672) | |
| | | | | | | |
| | | | | | | |
| **BALANCE CONSIDERING LITT SECURED CLAIM** | | | | | | |
| | | | | | | |
| WITH SETTLEMENT | ($1,558,241) | Litt lien of $340,000 | $699,384 | | ($1,976,672) | |
| | | | | | | |
| NO SETTLEMENT | ($2,322,744) | Litt lien of $1,104,503 | ($65,119) | | ($2,741,175) | |

## **CONCLUSION**

For the reasons set forth above, the Motion to Settle will be granted and the Motion to Abandon will be denied.

### ###

Date: October 23, 2018

_____
Geraldine Mund
United States Bankruptcy Judge