

FILED & ENTERED

MAR 29 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>Shirley Foose McClure<br><br><br><br><br><br>Debtor(s). | Case No.: 1:13-bk-10386-GM<br><br>CHAPTER 7<br><br>**MEMORANDUM OF OPINION ON SHIRLEY McCLURE'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES, GRANTING IN PART, DENYING IN PART, CONTINUING IN PART [dkt. 2143]**<br><br><u>Continued Hearing Date</u><br>Date:       June 6, 2023<br>Time:       10:00 AM<br>Courtroom:  303 [by Zoom] |

      Shirley McClure was the Debtor-in-Possession from the filing of this case at the end of 2012 until the chapter 11 trustee was appointed on August 3, 2016 [dkt. 1113]. The case was converted to chapter 7 on May 24, 2022.  John Reitman, represented by Landau Law LLP, was the trustee during the chapter 11 period and David Gottlieb, represented by Marshack Hays LLP, is the current chapter 7 trustee.  All of the items in this administrative claim occurred while Ms. McClure was debtor-in-possession or    Mr. Reitman was the trustee.

This claim was timely filed.  Ms. McClure sets forth the following as her request for an administrative claim:

Property Management Agreement – In late January 2012, the Court approved Ms. McClure as the property manager, with a compensation of $3,500 per month.  Ms. McClure then lists the various properties and notes that the cost to hire either one person to manage all of them or to hire multiple people in order to cover each location would have been prohibitively expensive.   She lists the duties of her original property management tasks.  These were expanded as time went on.  She worked closely with Jason McClure who maintained, repaired, and upgraded the properties.

Ms. McClure was not paid every month because the estate did not always have sufficient money to pay her.  Exhibit J lays out what was due and what was actually paid.  She was to be paid $3,500 per month for 43 months, which totals $150,000, but only received $56,530.  Her services provided a great benefit to the estate and were necessary and substantial.

Loans to the Estate – Ms. McClure loaned the fees that she did receive back to the estate so that the case would not be dismissed.  Her family provided loans to her for most of her living expenses.  She also deposited her exempt Social Security funds into the estate's general bank account – totaling $87,292

Paralegal, Case Management, and Litigation Support Agreed with Faye Rasch and the Farley Law Firm - When Ms. Rasch was employed at $275 per hour, it was conditioned on the agreement that Ms. McClure would be responsible for the paralegal duties; litigation support duties; preparation for filing, filing and service of pleadings; case expenses; maintaining all case files; and drafting filings for Ms. Rasch. [see dkt. 558]  This agreement was a substantial and necessary benefit to the estate and continued until the chapter 11 trustee was appointed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ms. Rasch was paid a $20,000 retainer and received an additional $19,745 on her interim fee application. Her total compensation was $83,022.50.  She paid Ms. McClure $5,000, which is deducted from this claim.  Without Ms. McClure's work, the fees would have been much higher.  And it should be noted that Ms. McClure holds a Corporation and Litigation Paralegal Certificate from UCLA.

The two most valuable assets of the estate were the pending superior court lawsuits of *McClure v. Litt* and *McClure v. Tidus*.  The original plan was to use the proceeds from the 30th St. property to pay the then-current attorneys on those cases (Makarem and Associates).  When the Court would not allow the $500,000 received from the sale of 30th St. to fund the state court litigation, Mr. Makarem refused to go forward.  Ms. McClure replaced them with the Farley Law Firm at a $150/hr rate plus 20% of the recovery. This was approved by the court.  It required Ms. McClure to provide paralegal services, though she was not being employed by the firm and they were not to pay her.  The Litt case was stayed, but Tidus was going forward and Ms. McClure provided discovery support, etc.  She was never compensated for this and it was to be by administrative claim.  These services were substantial, beneficial, and necessary.  They saved the estate attorney fees and support service fees.  Ms. McClure sets forth a comparison of the Farley agreement with the one proposed by the Trustee with Makarem, which is at a much higher hourly rate with monthly payments.

Ms. McClure then itemizes her claimed expenses for which she seeks reimbursement.  These are for the Litt and Tidus litigation preparation as well as other items paid for by the DIP.  [They also include items incurred after the Trustee was appointed.]

Photocopies & Printer Copies – $48,085.50

Bankruptcy Court - $17,190.60

Appeals to District Court - $12,803.10

Appeals to Ninth Circuit - $797.10

Superior Court Tidus costs - $17,294.70

Court Filing and Service - $12,280

      Bankruptcy Court - $10,295

      District Court - $1,210

      Superior Court - $300

PACER and Legal Research - $10,427.04

      Pacer - $6,754.80

      Superior Court - $1,872

      CaseText - $1,872

Postage and Express Mail - $7,895.20

Hearing Transcripts - $7,065.92

Litigation File Storage - $7,894.03

Property Equipment/Staging Storage - $40,324.60

Other Case Expenses – $19,092.78

TOTAL -$153,064.96

 

      Beyond that, Ms. McClure provided uncompensated services that were not included in the property management agreement:

      Bookkeeping, assisting with the tax audit, preparing and filing the MORs, maintaining the insurance on the estate properties.  Under the Trustee's control, these accounted for several hundred thousand dollars.

      Ms. McClure requests an immediate distribution that will take into account her health and care needs and the $40,000 in unpaid taxes on Gregory.  Ms. McClure and Jason have provided the estate with millions of dollars of benefit which have been paid to the Trustee's professionals.  Mr. Dahlberg is seeking $918,234.50 in compensation for trustee services that Ms. McClure had been performing.  This is on a claim of 1,727 hours, whereas Ms. McClure spent well over 6,000 hours on such services.

      In summary, Ms. McClure requests the following:

Reimbursements - $390,648.96

1          For property management and loans to the estate - $150,000

2          For exempt Social Security loaned to the estate - $87,292

3          Net expense reimbursement less $5,000 - $148,064.96

4  Personal Services - $312,708

5          Minimum for combined personal services - $425,000

6          Credit for 1st TD payments on Gregory – ($87,292)

7          Credit for Gregory property tax payments – ($25,000)

8

9  **Opposition by the Trustee**

10        The burden is on Ms. McClure to show that the expenses are "actual and

11  necessary" for preserving the estate for the benefit of its creditors.  This can include

12  services rendered after the commencement of the case including wages, salaries, and

13  commissions.  §503(b)(1)(A).  The claimant must show that the debt (1) arose from a

14  transaction with the estate and (2) directly and substantially benefitted the estate.  This

15  motion does not contain evidence to meet this test.  The controlling cases are

16  *Einstein/Noah Bagel Corp. v. Smithin re BCE W.*, 319 F.3d 1166 (9th Cir. 2003) and *NS*

17  *Microsolft Corp. v. DAK Indus. (In re DAK Indust.)*, 66 F.3d 1091 (9th Cir. 1995).

18        <u>As to property manager</u> – there is no evidence of this agreement.  As to the

19  contention that she received certain amounts and this provides the evidence (ex. J),

20  there are no bank statements or checks paid by the estate to support this.  There is no

21  evidence that an agreement existed or was approved by the court and Ms. McClure was

22  never employed as required by §327 or FRBP 2014.  Had she been properly employed,

23  §330 addresses subsequent compensation.  Section 330 details a list of items to

24  consider governing compensation – reasonable, necessary, the rates charged, what is

25  customary, duplication of services, services performed in a reasonable amount of time,

26  etc.  Authorization of the employment is a requirement to a claim.

27

28

Further, it is unclear what specific services were rendered and what benefit was provided to the properties and to the estate.  No evidence has been submitted as to this.

Lastly, because Ms. McClure is an insider, she is not entitled to compensation in a chapter 11 unless a notice of setting compensation is provided to creditors. §503(c); LBR 2014-1.  No notice was sent.

It should also be noted that the math is incorrect and the maximum requested under this category should be $93,870, not the entire $150,000.

As to loans to the estate – There is no evidence of a loan agreement or any approval by the court of any loans from Ms. McClure.  Section 364(a) allows an administrative claim for unsecured debt in the ordinary course of business.  But otherwise there must be court approval for the loan to be an administrative claim.  Here there is no evidence that the estate intended to repay Ms. McClure for these funds.

Ms. McClure asserts that these loans were to keep the case from being dismissed, but that does not necessarily provide a substantial benefit to the estate.

For paralegal services – Ms. McClure was not employed by the estate as a paralegal.  It is unclear how Ms. McClure calculated the $83,022.50 that she asserts and that this was a substantial benefit to the estate.

For case expenses incurred – Although hundreds of pages of receipts are attached, there is no explanation of what the receipts were for and how these directly and substantially benefitted the estate.

For additional services rendered outside of the alleged property management agreement – There is no evidence that Ms. McClure completed the listed services or that they benefitted the estate.  As a DIP, she was the estate's representative and not entitled to seek compensation for her time managing her own case.

///

///

///

1

**Opposition by Landau Law**

2

3

Ms. McClure, on multiple occasions, filed sworn documents that she had no administrative claim against the estate.  A list of these is as follows:

4

First Disclosure Statement documents – dkt. 251 (filed 10/1/13)

5

Second Disclosure Statement documents – dkt. 299 (filed 12/20/13)

6

Third Disclosure Statement documents – dkt. 1016 (filed 5/3/16) – specifically, if Ms.

7

McClure had included the administrative claim that she now asserts, it would have

8

eliminated the anticipated distribution to unsecured creditors.

9

As to property management fees – This is barred by §1115.  In an individual

10

chapter 11 case, services performed by the debtor after commencement of the case,

11

but before it is closed, dismissed, or converted become property of the estate.  This was

12

explained to Ms. McClure in 2019 (dkt. 1739, p. 19).  Beyond the mathematical issue

13

raised by the Trustee, any agreement to pay Ms. McClure was actually to pay the

14

estate.

15

As to loans to the estate – The disclosure statements and sworn declarations in

16

support thereof fail to reveal any loans, even though she contends that loans were

17

made before these dates. In her MORs, she shows the receipt of the social security

18

income, but not that they are loans or accruing administrative expenses.

19

Beyond that, no loan was authorized by the court or made in the ordinary course

20

of business. §§364(a), 364(b).  This approval must be obtained before the debt is

21

incurred.  An appropriate remedy for failure to do so is cancellation of the transaction.

22

*Thompson v. Morgen (In re McConville),* 110 F.3d 47 (9th Cir. 1997).  Also, the lender

23

may be relegated to the status of a general unsecured creditor. 3 Collier on Bankruptcy

24

P 364.03 (16th 2022).

25

There are two tests to determine whether the transaction is within the ordinary

26

course of business.  The vertical dimension is the creditor's expectation, which looks at

27

whether a hypothetical creditor is subjected to an economic risk of a nature that is

28

different from when he decided to extend credit.  This often involves a comparison

between the debtor's pre-and-post petition conduct.  There is no showing that Ms. McClure had a pre-petition practice of incurring debt to herself for spending her own Social Security funds and no creditor could have expected that such expenditures in her bankruptcy case would result in an administrative claim superior to their own claims.

The horizontal test looks at whether this is the type that similar businesses would engage in as part of the ordinary course of business.  Ms. McClure has not presented any evidence that it is ordinary for an individual to loan themselves their own money.

For reimbursement of expenses – Because under §1115 all of Ms. McClure's post-petition earnings are property of the estate, whatever expenses she paid was from property of the estate and not her personal property.  To the extent that payments were made by someone else (ie. her son), she cannot have an administrative claim.

For uncompensated services – She cannot claim compensation for services provided once the trustee was appointed.  The disclosure statements do not contain a claim for administrative services and neither do the MORs.

The Farley employment application says that they will not request compensation for Ms. McClure's services and does not indicate that she will be seeking compensation from the estate. It discusses the benefit to the estate of the use of Ms. McClure's knowledge and paralegal services, but that benefit would be wiped out if she were to receive an administrative claim for them, particularly if she were to receive the $530-$550 per hour that she seeks – the Farley Law Firm attorneys charged $150 per hour.

Similarly, the employment application of Ms. Rasch does not mention Ms. McClure receiving any compensation or an administrative claim for such compensation.

Beyond all of that, §1115  bars her claim for compensation as does §327(a) and §330(a),  Paralegals provide professional services and require employment by the court.  She was never employed by the court.

For the period after the trustee was appointed – Beyond a lack of detail, there is no showing that these actions benefitted the estate and that the Trustee induced her to litigate with him.  Both prongs are required under §503(b)(1)(A).  Her exhibits show that

1  some were from filing voluminous papers in opposition to the Trustee's proposed
2  settlement with Litt, which was approved by the Court.

3

4  **Omnibus Opposition by Weintraub & Selth**

5      This should be denied because creditors and the trustee were never given an
6  opportunity to evaluate and be heard as to the alleged loans and advances.  Also, the
7  alleged loans and advances were not authorized by the court.  Debtor did not seek
8  approval of her employment and has disinterestedness issues, consistently acting in her
9  own self-interest, and her filings have not benefited the estate.  There is insufficient
10 evidence. This request is long after the alleged loans were made.

11      Section 364 requires a notice and hearing. This is especially true when the
12 proposed lender is an insider or the debtor herself.  These are not "ordinary course"
13 loans and would not be approved as such.  Therefore the loan transaction may be
14 relegated to unsecured status or cancelled or disregarded.

15      As to working as a paralegal, she was not and could not be a professional in her
16 own case.

17

18 **Supplemental Opposition by Landau Law**

19      In response to the tentative ruling posted on January 25, 2023 – specifically as to
20 §1115 – Landau Law filed its Supplemental Opposition [dkt. 2270].  The arguments
21 concern the plain language of §1115 and the fact that there are no exclusions listed.
22 [Some cases are listed, though the Court finds that they are not on point or even
23 factually similar to the McClure situation.]  The Thirteenth Amendment simply does not
24 apply because this is not forced labor, but it was Ms. McClure's choice to work for the
25 estate.  It asserts that there is no form of estoppel that can apply.  Also, no notice was
26 given through the MORs to creditors and, since Landau Law was not part of the case
27 during the DIP timeframe, Landau Law had no ability to object.  Landau Law requests
28 that an evidentiary hearing be conducted in person.

**Supplemental Opposition by Trustee [dkt. 2290]**

[At the request of the Court, the Trustee filed this brief as to whether post-petition earnings in a chapter 11 case remain property of the estate when the case is converted to chapter 7.]  Once the case is converted to chapter 7, the law of the Ninth Circuit is split as to whether post-petition personal service income earned by an individual chapter 11 debtor is considered property of the estate or is recharacterized and treated as property of the debtor.  Various courts have struggled with congressional intent when it added §348(f) and the interaction of that provision with §1115(a)(2) and §541(a).  The ambiguity created, particularly in light of the certainty when a case under chapter 13 Is converted to chapter 7, leads each court to draw its own conclusion.

Although the majority have ruled that property obtained by the debtor during the chapter 11 period remains property of the estate after conversion, there is no dispositive decision by a court of appeals. The majority of courts that have dealt with this hold that any post-petition personal service income earned by the chapter 11 debtor prior to conversion to chapter 7 continues to be property of the estate.  In the 9th circuit, this is demonstrated by *Mann v. Copeland (In re Copeland)*, 609 B.R. 834 (D. Ariz. 2019).  The opposite ruling is in *Wu v. Markosian (In re Markosian)*, 506 B.R. 273 (BAP 9th Cir. 2014).  There has been no dispositive ruling.

## ANALYSIS

There are many lessons to be learned from this case.  Unfortunately, most are being learned at the expense of Ms. McClure.

The number of unfortunate choices made in this case are legendary and this is not the motion to catalog them.  They were not all by Ms. McClure, but many of them were and some led to the results in this motion.

///

///

1

## Property Management Fees

The centerpiece of this motion is that Ms. McClure, while a debtor-in-possession, managed the real property owned by the estate (which included renting, collecting rent, making sure that repairs were done, overseeing maintenance, paying taxes and mortgages, etc.).  The Trustee argues that as a DIP, she was required to obtain court approval for her employment and compensation. To some extent this is true in that she was using cash collateral; but other than that it was not required.

Section 327(a) requires court approval for the hiring by the trustee or debtor-in-possession of any professional person.  This specifically deals with "one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."

"Section 327(a) has no applicability to the post-petition employment of existing management for a debtor-in-possession. This should be apparent from the plain language of the statute when it requires the professionals being employed to be 'disinterested.' As defined by § 101(13), a disinterested person cannot be an insider…. The continued employment of existing management of a debtor-in-possession constitutes part of the operation of debtor's business and is within the ordinary course of business authorized by the Bankruptcy Code."  *Matter of All Season Industries, Inc,* 121 B.R. 822, 825 (Bankr. N.D. Indiana, 1990).

The few cases that seem to fall into this category concern DIPS who are corporations and not individuals.  While property managers are usually employed by order or consent of the court, a property manager is not a professional person and its fees do not fall under §§327-330.  The request for property management fees sought in this motion is for the type of work usually done by a property manager such as renting a unit, collecting rent, accounting, preparing information for the accountant to prepare and file tax returns, making repairs, paying bills, etc.

-11-

It should be noted that there is a difference between the work done by a property manager and that required of a debtor-in-possession or a chapter 11 trustee.  Ms. McClure is not entitled to compensation for such things as preparing the MORs, responding to requests by the OUST, hiring accountants and attorneys, etc.  But there is no showing that she sought or received money for these tasks.

The Trustee argues that §503(c) prevents an administrative claim by an insider, but that is only when the claim is for things that are outside the ordinary course of business and not justified by the facts and circumstances of the case. §503(c)(3).  Here Ms. McClure merely continued her prepetition duties as the property manager and this is the ordinary course of business for a person or entity who owns some 18 pieces of residential rental property, let alone in multiple states.

Beyond that the payment of property management fees was not hidden or secret. Seven of the properties were subject to liens for the benefit of Pacific Mercantile Bank (PMB), while four were secured to City National Bank (CNB). It was uncertain who held the lien on the Hewitt property. Beyond that there was Ms. McClure's home. All except Ms. McClure's homes were rentals or subject to being sold.

As required in order to use the rents – which were the sole liquid assets of this estate – Ms. McClure entered into cash collateral agreements with both lenders and these were noticed to the required creditors and approved by order of the Court.  To the extent that a creditor entered the case after the cash collateral agreements had ended (as is the situation concerning the Trustee and his counsel in this case), he cannot now object that he did not have timely notice before the money was used. Beyond that, these agreements and orders were on the docket at the time that a trustee was appointed and could have been discovered by due diligence.  If this was a concern to Mr. Reichman or Landau Law, they could have refused appointment.  But they did not.

The cash collateral agreement with Pacific Mercantile grants the following monthly fees for  "Property Management (including bookkeeping).  This does not include extra-ordinary circumstances should they arise." [dkt. 14]:

Corbett #1, 2, 3 - $335

Harrington - $245

Riverside - $260

Dalmation - $245

Hanapiilani #1 - $155

Gregory - $0


The stipulation with Pacific Mercantile states that it is not to cover insiders until such time as insider compensation notices are filed and approved (dkt. 14: 19-20).  It applied from January 2013 up to 4/23/13, but could be extended on written agreement approved by the court.

Apparently for technical reasons, the motion and stipulation was refiled on 1/30/12 as dkt. 62.  The hearing was on 1/29/13 and the order was entered as dkt. 69. The order ran through 4/30/13.

Thereafter a second stipulation with PMB was filed [dkt. 263] and granted with an order extending the agreement from 5/1/13 through 12/31/13 [dkt. 265].

On 12/31/13, there was an emergency motion as to PMB, which used the same budget and was granted on 1/2/14, with the order entered on  2/10/14  [dkt. 301, 312, 338]

The fourth stipulation with PMB was on 10/6/14 [dkt. 502]


The stipulation with City National Bank was virtually identical to that with PMB, but did not include the requirement of an insider compensation notice.  This stipulation provided for use of cash collateral through 4/30/13. [dkt. 73, 107]  The property management fee, including bookkeeping, was as follows:

Rossmore -  $290

30th st, - $0

Benton #3 - $199.50

Benton #4 $205

Other money for maintenance.

The CNB stipulation was continued on 5/9/13 through 7/31/13 [dkt. 150, 154]

The CNB stipulation was again continued on 8/13/13 and the order was effective from 8/1/13 through 11/30/13. [dkt. 210]

For some reason, on 8/14/13 there was an emergency motion for use of cash collateral [dkt. 204], which was withdrawn on 8/10/13 [dkt. 214]

There was also a motion to extend filed on 1/14/15  [dkt. 579], with a hearing continued many times, but no order seems to have been entered.

No agreement was entered into as to Hewitt, but on 3/25/15 a motion was brought as to CWMBS, the purported lender. The order for $645 per month was entered on 5/6/15. [dkt. 707]

Although she breached the PMB stipulation by not filing a notice of insider compensation, that is a matter between Ms. McClure and PMB and their silence during multiple extensions of the agreement shows their acceptance of the situation.

Although cash collateral is property of the estate, because there is no other written and noticed agreement, the Court finds that the management fees paid to Ms. McClure are set by each property and are in the amounts of the cash collateral agreements with PMB and CNB.  As to Hewitt, there was an order, but not until April 2015, although Ms. McClure did take a management fee starting several years earlier.

There is no evidence that Ms. McClure had a specific property management agreement for the sum of $3,500 per month,  But because of these noticed stipulations and orders, the Court does not question any fees paid to Ms. McClure for her role as manager, so long as they were within the agreed amounts.  Also it makes sense that

the amount in question would decline as properties were sold.   She also indicates that she did not always pay herself if cash was lacking.

The chart below lays out the agreed management fees and the amounts that Ms. McClure actually paid herself on a sample basis of the month of April each year.  Again, she did not always pay herself because of a shortage of cash.  She did not always stick to the exact amount and her "salary" for some properties went up or down from sample month to sample month.  But in calculating the amount due, the Court will hold her to the cash collateral agreement for each property.

Two properties are uncertain.  The order on Hewitt came in 2015 and it was for $645 per month.  But up to that time, Ms. McClure had paid herself $412 per month and that is the figure that the Court will use as a reasonable fee.  The other is for the Michigan and Indiana properties.  I believe that they were owned free and clear and there was no order to pay a management fee.  Twice Ms. McClure distributed some money to herself, being a total of $1,180, but there is no order on this that I am aware of.

Using the figures in her exhibit J that she received a total of $56,630.50 for property management fees and calculating the fees that the Court will allow based on the cash collateral agreements, the unpaid balance is $67,745 (see the chart below).

As to the issue of §1115, there is little law for guidance to the Court.  This provision, which was added in 2005 as part of the package of amendments which were titled "Bankruptcy Abuse Prevention and Consumer Protection Act" amends the definition of "property of the estate" to include "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first."  §1115(a)(2).

Personally I have a lot of trouble applying the theory that property of the estate is used to pay a debtor and still remains property of the estate, so the debtor receives nothing for her services.  To get around this, cases talk about property that remains after the debtor uses what is necessary for her upkeep (food, housing, etc).

And there is yet another unresolved issue:  Ms. McClure only received personal services income while she was a debtor-in-possession (2012-2016).  But the conversion to chapter 7 took place in May 2022.  Does this mean that she could use any money that remained in 2016 to support herself until the conversion some six years later or even until the case is dismissed or closed?

However there is no showing that Ms. McClure had any extra cash.  If necessary the Court could take evidence on this and it may exist in her MORs.  If not, Ms. McClure could present tax returns, bank records, or other documents to show the surplus that remained at the time of the conversion.  However this will not be necessary.

As noted in the Trustee's supplemental opposition, it is still an open question as to whether post-petition earnings of the debtor during the chapter 11 period remain property of the estate after conversion to chapter 7.  Assuming that there were any such monies in existence at that time, I will be ruling that they revert to the Debtor as her property and not to the estate. The majority of courts have held otherwise and while I could weigh-in on the various statutory interpretations of §348(f) in relationship to §1115, some years ago I decided that I am bound by holdings of the Ninth Circuit Bankruptcy Appellate Panel.  *Life Ins. Co. v. Barakat (In re Barakat)*, 173 B.R. 672 (Bankr. CDCA, 1994), aff. by 99 F.3d 1520 (9th Cir. 1996), cert. denied 520 U.S. 1143 (1997), rehearing denied 520 U.S. 1225 (1997).  I am not aware of any court of appeals that has determined the binding effect of its BAP – and certainly this has not been ruled on by the Ninth Circuit Court of Appeals, which affirmed me on other grounds.

Because of this, there is no reason for Ms. McClure to prove what was left at the time of the conversion from her personal services earnings.  The only question that might arise at some future time is whether the monies paid to her were proper for the work that she did during the pendency of the chapter 11 while she was debtor-in-possession.

But that is not the question in this claim.  It appears that Ms. McClure did not actually receive all of the management fee money that she asserts he was entitled to

because there was not enough cash in the estate for her to pay herself.  So the first

question is how much she was entitled to and did not receive.  Then the next issue, if

the court were to follow the majority of cases, is how much of that would be

reimbursement for her personal living expenses

Lastly, I just want to make it clear that the work that Ms. McClure did as property

manager was in the ordinary course of business for this estate.  Also, as to notice or the

amounts, each MOR sets forth such a fee.  These are available to any interested party.

No one objected.  The OUST reviews these MORS and did object to other issues

including the failure to file complete MORs, facial inaccuracies in the MORs, incorrect

reporting of income from Hewitt, etc. [for example, see dkt. 524]  But nary a word about

the management fees that were reported and were clearly paid to herself.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Benton #4 |  | $205 |  | $210 | $210 |  | 2/19/16; dkt. 929 |
| Corbett (#1, 2, 3) | $1,005 |  |  | $1,005 | $1,300 |  |  |
| Dalmation | $245 |  |  | $245 | $254 | $252 |  |
| Gregpry | $0 |  |  |  | $268 |  |  |
| Hanoapiilani | $155 |  |  |  | $412 |  |  |
| Harrington | $245 |  |  | $245 | $260 | $260 |  |
| Hewitt |  |  | $645 | $412 | $390 | $150 |  |
| Riverside | $260 |  |  |  |  | $260 | 7/27/15; dkt. 771 |
| Rossmore |  | $290 |  | $290 |  |  | 6/15/16; dkt. 1061 |
| 30th Street |  | $0 |  |  |  |  | 5/14/13; dkt. 155 |
| MI & IN |  |  |  |  |  | $1,000 |  |
| TOTAL | $1,910 | $695 | $645 | $2,607 | $3,299 | $1,922 |  |

|  | PER MONTH (Hewitt at $412) | TOTAL (Hewitt at $412) |
|---|---|---|
| TOTAL ALLOWED - JAN. 2013 THRU JULY 2015 | $3,017 | $93,512 |
| TOTAL ALLOWED - AUG. 2015 THRU FEB. 2016 | $2,757 | $19,296 |
| TOTAL ALLOWED - MAR. 2016 THRU JUNE 2016 | $2,352 | $9,406 |
| TOTAL ALLOWED - JULY 2016 | $2,062 | $2,062 |
| TOTAL ALLOWED |  | $124,275 |
| AMOUNT RECEIVED |  | $56,530 |
| **AMOUNT OF CLAIM FOR PROPERTY MANAGEMENT** |  | **$67,745** |

1

## Asserted Loans to the Estate

2    Ms. McClure asserts that she loaned the fees that she did receive back to the

3  estate so that the case would not be dismissed, that her family loaned her the money for

4  her living expenses, and that she deposited her exempt Social Security funds into the

5  debtor's general bank account.  She claims $87,292 for these items.

6    There is no evidence that any of these was a loan and not a gift.  In fact, given

7  that she would be the beneficiary of any overage in the estate at the end of the case, it

8  is logical that she would contribute money to make sure that there was insurance,

9  property taxes were paid, repairs were made, etc.  Throughout this case she worked

10  very hard to keep as many properties as possible and only sold or let go of those that

11  she had to.  She also wanted to remain a debtor-in-possession and that meant that the

12  estate could not fall into administrative insolvency.  So she had a lot to gain with this

13  contribution to the future of the estate.

     Unlike the property management fees, there is nothing on which to base an
14
   estoppel claim when it comes to the Social Security contributions.  They were not
15
   revealed in the MORs as loans or categorized in that fashion in the disclosure
16
   statements.  No notice was given that these were loans and not contributions.  No court
17
   order was sought or granted.
18
     Beyond that, even if these were loans and not gift, they do not meet the test to be
19
   in the ordinary course of business.  There is no indication that a creditor of this estate
20
   would expect Ms. McClure to support the case through putting in her own money.
21
   There is no history to show that this was her usual practice.  And there is no evidence
22
   that similar businesses acted in this way.  But, as noted above, this is superfluous
23
   because there is no indication that these were meant to be loans and not gifts.
24

25

## Paralegal, Case Management and Litigation Support Fees
26

27    Part of the reason that Ms. McClure has suffered during this case was because

28  she decided to keep control and hire counsel only when absolutely necessary and for

limited purposes.  It is clear that Ms. McClure is a highly trained and competent

paralegal.  Just look at the result of the Long Beach litigation and the quality of papers

that she has filed in this case.  But it is also clear that she does not have sufficient

knowledge or competence in the intricacies of bankruptcy law and procedure.  Had she

hired and listened to trained bankruptcy counsel, her "loans" would have been

documented and approved by the Court, it is likely that a trustee would not have been

appointed, and this whole case would be in a different place.  But that is hindsight.


History of bankruptcy counsel:

12/21/12 – Greenberg & Bass (Andrew Goodman, James Felton, Yi Sun Kim) – thru

about 1/20/15 [dkt. 966], though Ms. McClure states that this was through 8/14 [dkt,

2143. p. 4]. Greenberg & Bass filed 10/1/13 disclosure statement [dkt. 251]; filed

12/20/13 amended disclosure statement [dkt. 299].  MORs were filed by Greenberg &

Bass until 7/23/14, but apparently prepared by McClure.   [dkt. 966, p. 6-7]


11/7/14 - Faye Rasch was special bankruptcy counsel to assist Ms. McClure, who

remained *pro per* – thru 5/6/16 [dkt 517, 1320]


12/10/15 -Weintraub & Selth, APC was special bankruptcy counsel to assist Ms.

McClure, who remained *pro per* (James Selth, Daniel Weintraub, Elaine Nguyen) – thru

about 5/17/16 [dkt. 841, 1813]


5/3/16 – McClure filed her disclosure statement that was prepared with the assistance

of Weintraub & Selth [dkt. 1020]


     Starting in 2014, Ms. McClure hired Faye Rasch to advise her, but it was Shirley

McClure who remained *pro per*.  Similarly, at the end of 2015, she hired Weintraub &

Sleth as her special counsel, but once again she remained *pro per* and in that way she

was able to control the case. As to her case management support, there was never any agreement by the attorneys or by the court that she would be compensated for the time spent.  It was her choice to hire attorneys at a lower rate by supporting their work with her own.  Once again, this prevented the appointment of a chapter 11 trustee because it was clear that Ms. McClure needed counsel. The last thing that she wanted was to lose control of the case and this was one way to prevent that.

Are independent paralegals professionals for the purposes of §327(a)? There are no cases right on point.  Most deal with compensation of a paralegal within a law firm or whether the paralegal needed to be licensed by the state. For example, *see In re Semenza*, 121 B.R. 56 (Bankr. Montana, 1990).  In the present case the law firms and Ms. McClure waived any assertion that the estate should compensate her for paralegal work done in conjunction with those attorneys.

It appears that an independent paralegal who is not part of an attorney's firm and is being paid outside of the fee approved for the attorney is a professional and must be approved by the court. She was not approved by the Court to provide paralegal services as a professional who was entitled to an administrative claim under §§327-§330.

Beyond that, as to her work when there was no active attorney employed and working and as noted above on other issues, there is no indication that Ms. McClure intended to be paid from the estate or that the Court intended to pay her.

There will be no claim allowed for paralegal or litigation support services provided by Ms. McClure.

Expense Reimbursement

Claims for expense reimbursement by the Debtor come under §503(b)(1)(A), which states

(b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)  (A) the actual, necessary costs and expenses of preserving the estate,

including—

(i) wages, salaries, and commissions for services rendered after the

commencement of the case; and

(ii) wages and benefits awarded pursuant to a judicial proceeding or a

proceeding of the National Labor Relations Board as back pay attributable to any

period of time occurring after commencement of the case under this title, as a

result of a violation of Federal or State law by the debtor, without regard to the

time of the occurrence of unlawful conduct on which such award is based or to

whether any services were rendered, if the court determines that payment of

wages and benefits by reason of the operation of this clause will not substantially

increase the probability of layoff or termination of current employees, or of

nonpayment of domestic support obligations, during the case under this title;

Section 503(b)(1)(A) gives examples of the types of expenditures that qualify, but

does not limit them to these particular items.  However, it does require that they

are/were actual and necessary to the preservation of the estate.  There is also no

limitation as to who made the expenditures: the DIP, a trustee, a creditor, the debtor, or

an interested party all qualify.

Debtor-in-Possession Expenses

Prior to the appointment of the trustee, most or all of Ms. McClure's expenditures

fell into three categories: litigation against the Litt and Tidus parties; repair,

maintenance, leasing, or sales of the real property; and dealing with status reports,

filings with the OUST and the court.

Prior to August 2016, any money that Ms. McClure spent for transcripts, filing

fees, copies, postage, mileage, etc. in this bankruptcy case or in the appeals are

allowed administrative expenses unless these were unreasonable.  These are the type

of costs that an estate must pay.  They do not fall under §1115 as earnings for the debtor.  To the extent that they supported the work of the various counsel, they are necessary and would be reimbursed to those attorneys without question.  So there is no reason that Ms. McClure needs to be out-of-pocket.

The fact that she was usually on the losing side does not make them unreasonable.  Her successful attempts to block and delay the Litt parties from executing on her properties were reasonable undertakings.  I have no way of knowing whether the Litt state court case had much value, but apparently Mr. Litt thought that it was worth defending and did everything that he could to block it from going forward. Ultimately the settlement with Litt, which was very substantial, was at least in part because of the ongoing litigation by Ms. McClure.  Similarly, the settlement with the Tidus parties was because Ms. McClure proved to this Court that there was value and merit in that state court action.

The opposition raises the question of whether the outlay was on behalf of the estate or solely for the benefit of Ms. McClure.  Obviously she would be the beneficiary of any overage in the estate.  But this does not mean that her work to preserve the properties was solely for her own benefit.  Her fights with Litt certainly had an element of personal animus, but they were also necessary to prevent him from executing on the various properties and to try to force him to remove his liens on properties that were to be sold so that the sales could be completed and the cash could be used by the estate.

If there are any specific categories for the debtor-in-possession period that the opposition believes do not fall into those classifications, please point them out.

Thus, I have no hesitancy to award her the reimbursements of the amounts that she spent while she was a debtor-in-possession.  But once the Trustee was appointed, she could no longer act on behalf of the estate unless requested to do so by the Trustee or his agent.  Nonetheless, her costs are reimbursable administrative expenses if they meet the requirement of being actual and necessary to the preservation of the estate. These need to be handled in detail to show that they qualify.

1 | After the Trustee was Appointed

2    It is less clear as to the expenses for items after the Trustee was appointed.  As

3 noted above, any cost incurred at the request of the Trustee or his agent is to be

4 reimbursed.  For example, if the Farley Firm was working for the Trustee in 2017, Ms.

5 McClure is entitled to an administrative claim for the costs for copying, Bates marking,

6 scanning, etc. come 120,000 pages that she did at the request of the Farley firm. [See

7 dkt. 2143, p. 13] If the Farley Firm was not working for or with the Trustee but the

8 Trustee received these documents and they aided him in analyzing the Tidus case or

9 the Litt case, they would still qualify for an administrative reimbursement claim.

10    Some of the costs were for fighting the prior trustee on the Tidus $100,000

11 settlement.  While her initial proposals to buy the Tidus matter by giving the estate a

12 percent of her "win" - if she did win - was not practical from the beginning and could not

13 reasonably benefit the estate as against a cash offer by the Tidus defendants, she

14 prevailed on her opposition to the $100,000 settlement figure.  Ms. McClure's opposition

15 to the Trustee's settlement motion and his appeal resulted in an additional $200,000 for

16 the estate. Her costs of opposition and appeal qualify as actual and necessary to

17 preserving the estate.

18    But there were other oppositions and appeals that were more for the individual

19 benefit of Ms. McClure.

20    In her motion for this administrative claim, Ms. McClure provides extensive

21 documentation as to each outlay for which she is seeking reimbursement.  But Exhibits

22 A, B, C, D, E, and H starting in 2016 need to be categorized to certain motions, etc.

23    Exhibit F items will be allowed in the amount of $7,894.03.  Exhibit G items

24 should have been made available to the Trustee, if needed, but did need to be stored as

25 long as properties were being sold or rented.  Also these are property of the estate and

26 the Trustee could have sold them, but did not.  So, if Ms. McClure can show that she

27 made the Trustee aware of these items, the Exhibit G costs will be allowed in the

28 amount of $40,324.50.

## Summary

| Area | Amount allowed | Amount denied | To be determined | Comments |
|---|---|---|---|---|
| Property Management | $67,745.00 | $25,625.00 | | |
| Loans | $0.00 | $87,292.00 | | |
| Paralegal and Litigation Support | $0.00 | $83,022.50 | | |
| Expense Reimbursement | | | | |
| Ex. A (photocopies and printer copies) | $10,091.85 | | 7098.75 | allowed thru 2015; tbd starting 2016 |
| Ex. B (court filing and service) | $11,046.00 | | $49,319.50 | allowed thru 2015; tbd starting 2016 |
| Ex. C (PACER and legal research) | $4,057.09 | | $6,369.95 | allowed thru 2015; tbd starting 2016 |
| Ex. D (postage) | $5,490.59 | | $2,404.61 | allowed thru 2015; tbd starting 2016 |
| Ex. E (transcripts) | | | $7,065.92 | allowed thru 2015; tbd starting 2016 |
| Ex. F (file storage) | $7,894.03 | | | allowed thru 2015; tbd starting 2016 |
| Ex. G (property equipment storage | | | $40,324.50 | if shows that Trustee knew of these |
| Ex. H (other) | | | $19,092.78 | specifics needed |
| | | | | |
| TOTAL | $106,324.56 | $195,939.50 | $131,676.01 | |

As it stands today, the above chart shows what is allowed, what is denied, and what needs further information.  The Court is ruling that the determination on Property Management, Loans, and Paralegal and Litigation Support are final rulings.  The Expense Reimbursement requests will be continued to June 6, 2023 for further

evidence as shown in the table above.  The dates are as set forth in the Order accompanying this Memorandum.

At this point in time I do not see any need for an evidentiary hearing.

Ms. McClure is also requesting an immediate distribution of part of the allowed claim.  This is not unreasonable in that the district court allowed the Landau Firm to be paid 20% of its claim [USBC dkt. 2239; USDC 8:22-cv-00177, dkt. 64].  This is appropriate unless there is a stay.

Therefore, unless there is a stay, Mr. Gottlieb is ordered to distribute the amount of $21,264.91 without delay on or after April 25, 2023 unless there is a stay..

###

Date: March 29, 2023

_____
Geraldine Mund
United States Bankruptcy Judge